UNITED STATES of America, Plaintiff,

v.

ARTICLES OF HAZARDOUS SUBSTANCE, etc., Defendants.

No. C–78–23–G.

United States District Court,
M. D. North Carolina,
Greensboro Division.

Feb. 8, 1978.

**1262**

H. M. Michaux, Jr., U. S. Atty., and Patricia W. Lemley, Asst. U. S. Atty., Greensboro, N. C., for plaintiff.

Norman B. Smith and John T. Manning, Greensboro, N. C., for defendants.

## MEMORANDUM OPINION

GORDON, Chief Judge.

On January 18, 1978, the United States, acting for the Consumer Product Safety Commission (CPSC), obtained an ex parte warrant of seizure from the Clerk of this Court, directing the seizure of quantities of several different types of children's sleepwear which were treated with a substance commonly known as TRIS. As authority for its action, the government invoked 15 U.S.C. § 1265, a provision of the Federal Hazardous Substances Act (FHSA), which permits seizures of goods pursuant to a libel of information. The United States Marshal thereafter entered the place of business of Troxler Hosiery Company, Inc., and seized the articles specified.

Troxler Hosiery Company, Inc. (Troxler), promptly filed a motion to quash the warrant of seizure. The government then moved to strike Troxler's motion to quash the warrant of seizure on the grounds Troxler had failed to file a verified claim and answer as required by Rule C(6) of the Supplemental Rules of the Federal Rules of Civil Procedure. A hearing was held on both motions on January 25, 1978. In an order entered on January 27, 1978, the Court denied the government's motion to strike Troxler's motion and granted Troxler's motion because it found that the procedures employed by the government violated Troxler's constitutional rights. This opinion provides a fuller statement of the Court's reasons for entering the order.

### Background

On April 8, 1977, the Consumer Product Safety Commission undertook to ban TRIS-treated articles on the theory that they are carcinogenic, by publishing a proposed amendment to 16 C.F.R. sec. 1500.18, to define as a hazardous substance, children's wearing apparel made from fabric containing TRIS. 42 Fed.Reg. 18850 (1977).

The Commission was enjoined on June 23, 1977, by the United States District Court for the District of South Carolina from enforcing the regulation banning TRIS, because the Commission had failed to follow the statutory provisions requiring notice, opportunity for hearing, and judicial review before adopting the regulation. *Springs Mills, Inc. v. Consumer Product Safety Commission*, 434 F.Supp. 416 (D.S.C.1977). On August 11, 1977, the United States Court of Appeals for the Fourth Circuit declined to stay the injunction pending appeal, but indicated that the injunction did not prohibit the Commission from taking individual enforcement actions against manufacturers and sellers of TRIS products. (No. 77–1969)

On December 6, 1977, the Commission withdrew its earlier "publications" banning TRIS. In their place the Commission issued a policy statement, reiterating its belief that TRIS products are banned hazardous substances. To support this belief, the Commission simply cited its earlier publications and undisclosed new information. The Commission also stated its intention to file individual enforcement actions to prevent sales of TRIS products. The Commission also stated that in these enforcement actions the Commission could and would not rely on its previously published "interpretations" or on its new "policy statement" to prove any hazards associated with TRIS. 42 Fed.Reg. 61621–22 (1977).

### Motion of the Plaintiff to Strike Motion to Quash Warrant of Seizure

█ The government has moved to strike Troxler's motion to quash the warrant of seizure on the grounds Troxler failed to file a verified claim stating its interest in the seized children's sleepwear and failed to file an answer pursuant to Rule C(6) of the Supplemental Rules of the Federal Rules of Civil Procedure. The Court has examined the affidavits filed with Troxler's motion and concludes that Troxler has made a sufficient showing of its interest in the seized goods to challenge the government's seizure action. Although Troxler's motion may not be in technical compliance with Rule C(6), the Court would, if necessary, deem Troxler's motion and accompanying affidavits to be the claim required to be filed by Rule C(6).

### Motion to Quash Warrant of Seizure

█ Troxler's first contention is that the Commission is not authorized by statute to seize TRIS-treated sleepwear. Troxler reads the *Springs Mills* decision in a way that would permit the CPSC to move against TRIS-treated goods only after conducting rule-making pursuant to 15 U.S.C. § 1261(q)(1)(B) or (q)(2). *Springs Mills, however*, held only that the Commission may not promulgate a nationwide ban on such products without first conducting for-

mal rule-making pursuant to § 1261(q)(1)(B). The Commission contends in this Court that it may elect to proceed to establish a nationwide ban under the formal rule-making procedures set out in § 1261(q)(1)(B) or that it may proceed on a case-by-case basis under the criminal provisions of 15 U.S.C. § 1264, under the injunctive procedure of 15 U.S.C. § 1267, or as it has done here, under the seizure provisions of 15 U.S.C. § 1265. Resolving this question requires an examination of the structure of the Federal Hazardous Substances Act.

Section 1265 provides that "misbranded hazardous substances" and "banned hazardous substances" are liable to seizure by process pursuant to a libel of information. As previously stated, the Commission contends that the TRIS-treated goods seized from Troxler are "banned hazardous substances." A substance may be a "banned hazardous substance" either by meeting the definition in § 1261(q)(1)(A) or the one in § 1261(q)(1)(B). Section 1261(q)(1)(B) defines the term to include any substance which the Commission finds, after formal rule-making, to meet certain criteria. Section 1261(q)(1)(A), on which the Commission relies in this case, defines banned hazardous substances to be "any toy, or other article intended for use by children, which is a hazardous substance, or which bears or contains a hazardous substance in such manner as to be susceptible of access by a child to whom such toy or other article is entrusted." The Commission further contends that the seized children's sleepwear meets the requirements of § 1261(q)(1)(A) because the TRIS with which they are treated meets the definition of hazardous substance in § 1261. Section 1261(f)(1) defines a hazardous substance as:

"(A) Any substance or mixture of substances which (i) is toxic, (ii) is corrosive, (iii) is an irritant, (iv) is a strong sensitizer, (v) is flammable or combustible, or (vi) generates pressure through decomposition, heat, or other means, if such substance or mixture of substances may cause substantial personal injury or substantial illness during or as a proximate

result of any customary or reasonably foreseeable handling or use, including reasonably foreseeable ingestion by children.

"(B) Any substances which the Secretary by regulation finds, pursuant to the provisions of section (3)a, meet the requirements of subparagraph 1(A) of this paragraph.

"(C) Any radioactive substance, if, with respect to such substance as used in a particular class of article or as packaged, the Secretary determines by regulation that the substance is sufficiently hazardous to require labeling in accordance with this Act in order to protect the public health.

"(D) Any toy or other article intended for use by children which the Secretary by regulation determines, in accordance with section 3(e) of the Act, presents an electrical, mechanical, or thermal hazard."

The Commission contends that TRIS meets the statutory definition of hazardous substance contained in § 1261(f)(1)(A) because it is toxic within the meaning of § 1261(g). That subsection provides that the "term 'toxic' shall apply to any substance (other than a radioactive substance) which has the capacity to produce personal injury or illness to man through ingestion, inhalation, or absorption through any body surface."

From an examination of the FHSA's structure, it appears that a substance may be a banned hazardous substance either because it has been so defined by the Commission in formal rule-making or because it meets the statutory definition in § 1261(q)(1)(A). Similarly, it appears that a substance may be a hazardous substance because it has been so defined by the Commission by regulation or because it meets the statutory definition contained in § 1261(f)(1)(A). This reading of the statute is also supported by the FHSA's legislative history which states:

"The [Act] covers substances which are toxicants, corrosives, irritants, strong sensitizers, flammable, and also substances which generate pressure. It also covers

any radioactive substance (other than those mentioned below) if, with respect to such substance as used in a particular class of article or as packaged, the Secretary of Health, Education, and Welfare [now the Commission] determines by regulation that is sufficiently hazardous to require labeling in order to protect the public health. The Secretary also may, by regulation, declare to be a hazardous substance any substance which he finds meets the requirements of the basic definition of this term in the bill, if such action would promote the objectives of this legislation by avoiding or resolving uncertainty as to its application." 1960 U.S.Cong. & Admin.News at 2833.

From the foregoing examination of the FHSA, it appears that § 1265 authorizes seizure of goods which meet the statutory definitions provided in § 1261. Whether or not TRIS-treated children's sleepwear is, in fact, a statutorily "banned hazardous substance" is the question which is to be later decided should a jury be empanelled to hear the merits of the condemnation suit. But because the Court accepts the Commission's interpretation of the FHSA, it must now proceed to consider Troxler's constitutional challenges to the seizure of its goods.

### Fourth Amendment

 Troxler's first constitutional challenge to the seizure is that the procedure used by the government to seize its goods violates the Fourth Amendment. The government in procuring the § 1265 seizure warrant somewhat justifiably relied on the Admiralty procedures outlined in Supplemental Rule C of the Federal Rules of Civil Procedure. Pursuant to Rule C, the government was able to obtain a warrant of seizure from a deputy clerk of this Court simply by filing its verified complaint. The Court agrees with Troxler that this procedure violates the Fourth Amendment.

There can be no doubt that the Fourth Amendment applies to civil and administrative actions, just as it does to the government's actions in criminal matters. See *Camara v. Municipal Court,* 387 U.S. 523, 87

S.Ct. 1727, 18 L.Ed.2d 930 (1967); *See v. City of Seattle*, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967); *Laprease v. Raymours Furniture Co.*, 315 F.Supp. 716 (N.D.N.Y.1970) (three-judge court). In *Founding Church of Scientology v. U. S.*, 133 U.S.App.D.C. 229, 409 F.2d 1146 (1969), the Court of Appeals for the District of Columbia ruled that the Fourth Amendment applied to a seizure made under 21 U.S.C. § 334, a provision of the Food, Drug and Cosmetic Act that is nearly identical to 15 U.S.C. § 1265. In so holding, Judge Skelly Wright said:

"Though warrants are generally necessary for arrests of persons and for searches, the warrant requirement has not traditionally been imposed upon seizures of the type involved in this case—attachment of property in the course of civil proceedings. This does not mean that the Fourth Amendment does not apply to such seizures, in both its substantive prohibition against unreasonable seizures and its procedural requirement of judicial or quasi-judicial review of the decision to seize. It means merely that judicial restraint is imposed through a different form of proceeding than the showing of probable cause before a magistrate. In the case of ordinary civil attachments, the details of such proceedings are, even in the federal courts, left to state law. In cases of admiralty, the process is governed by the Admiralty Rules, lately recodified as a supplement to the Civil Rules." 133 U.S.App.D.C. at 233, 409 F.2d at 1150. [Footnotes omitted].

The Court of Appeals held that, upon the particular facts of the case, the seizure made upon the libel of information met the Fourth Amendment's requirement of reasonableness.[1]

While the Court of Appeals in *Founding Church of Scientology* rejected the requirement of a probable cause showing, the plain language of the Fourth Amendment would seem to make such a showing essential where, as here, a warrant was obtained. Furthermore, the Supreme Court's decision in *Camara, supra*, 387 U.S. at 534–39, 87 S.Ct. 1727, expressly adopted the probable cause standard for use in issuing civil and administrative warrants. Just as is the case with admiralty warrant here used, the administrative searches at issue in *Camara* had not traditionally been subjected to a probable cause requirement. Absent some strong reason to the contrary, the Court will not disregard the probable cause standard adopted by the Supreme Court in *Camara*.

Using this standard, the Court finds that the verified complaint used to obtain the warrant of seizure did not establish the existence of probable cause. Nevertheless, the verified complaint was sufficient to establish probable cause to believe that TRIS-treated garments were to be found on Troxler's premises. The complaint, however, contained only an unsupported allegation that these garments were "banned hazardous substances" within the meaning of § 1261. Therefore, the complaint was inadequate to establish probable cause to believe the described garments were "banned hazardous substances" subject to seizure under § 1265.[2]

▪ The warrant procedure employed by the government in this case is defective in another respect. The Supreme Court's decision in *Camara* made clear that the most important procedural safeguard provided by the Fourth Amendment warrant ma-

---

1. The Court is aware of the old decision in *United States v. 935 Cases More or Less, Etc.*, 136 F.2d 523 (6th Cir. 1943), which held that a seizure under 21 U.S.C. § 334 is not a search or seizure within the meaning of the Fourth Amendment. The Court, however, believes that this case has been overruled by the later cases cited above.

2. The Court believes that had TRIS-treated garments been found to be "banned hazardous

substances" in a proper rule-making proceeding conducted in accordance with § 1261(q)(1)(B), the allegation would have been sufficient to establish probable cause. Similarly, had the complaint been accompanied by the documentation of TRIS' alleged toxic nature which the government provided this Court after the seizure was challenged, the probable cause requirement might have been met.

chinery is the insertion between the government and the individual of an independent judicial officer to assess the need for the search of seizure. *Camara v. Municipal Court, supra* at 532–33, 87 S.Ct. 1727. In the instant case, the deputy clerk of this Court, in reasonable reliance on Rule C(3) of the Federal Rules of Civil Procedure, issued the warrant of seizure upon the filing of the complaint. Issuance of the warrant under Rule C(3) is a purely ministerial act; the clerk has no discretion to refuse to issue the warrant. Hence, the procedure used by the government to obtain the warrant to seize Troxler's goods was fundamentally defective because it did not provide for a review by an independent and disinterested judicial officer.[3]

### *Fifth Amendment Due Process*

Troxler's second constitutional challenge to the seizure is that the procedure the government is using violates the Due Process Clause of the Fifth Amendment. Resolving this issue is difficult because of the flexible character of procedural due process and the problem of ascertaining what constitutes procedural due process in light of the continuing development of the concept. The decision in this case is made more difficult because the revolution in the area of procedural due process has taken place more in the areas of debtor-creditor relations, government employee firings, and government benefit denials than in this area of the law. For this reason, in making its decision, the Court must be guided largely by analogy and must attempt to discern how the principles of due process which have been hammered out in other areas should be applied to the case at hand. The Court believes the greatest guidance is to be drawn from those decisions which have considered whether procedures allowing prejudgment seizures and attachments of property comported with the requirements of due process.

At the outset, the Court is met with the government's contention that in *Ewing v. Mytinger & Casselberry, Inc.,* 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088 (1950), the Supreme Court expressly upheld, on Fifth Amendment due process grounds, a pre-hearing seizure of misbranded goods under 21 U.S.C. § 334, the seizure provision of the Food, Drug & Cosmetic Act. In *Ewing*, the plaintiff instituted suit to block seizures of its goods, contending that before the government could initiate judicial proceedings to seize its goods, the plaintiff was entitled to a hearing before the federal administrator who made the initial determination to initiate the judicial action. The Supreme Court held that due process did not require the administrator to give the plaintiff a hearing prior to the initiation of judicial action. The Supreme Court held instead that due process could be accorded by an opportunity for a hearing and a judicial determination provided as a part of the later seizure action. Thus, in *Ewing*, the Supreme Court did not decide the question presented by this case: What procedures the Due Process Clause requires as a part of the seizure and condemnation action. Later Supreme Court decisions that have mentioned *Ewing* have put a gloss on the *Ewing* holding which has some importance in the instant case. These decisions read *Ewing* to set out a rule that due process does not require a pre-seizure hearing as a part of the judicial enforcement action in this

---

**3.** Even though the Court of Appeals did not require a probable cause showing in *Founding Church of Scientology*, the Court did recognize that prior judicial review of warrants is a fundamental aspect of the Fourth Amendment protections. 133 U.S.App.D.C. at 233, 409 F.2d at 1150. In that case the libel of information was subject to scrutiny by a United States District Judge, and it was only after his review and by court order that the warrant of seizure issued. This prior judicial review was one of the factors on which the Court of Appeals expressly relied in holding that the seizure met the Fourth Amendment's reasonableness standard.

The Court observes that the procedures followed by the government in the *Founding Church of Scientology* case, differ significantly from those followed in the case at hand. Thus the Court's ruling should not disable the government from obtaining warrants pursuant to libels of information filed under 15 U.S.C. § 1265 or under 21 U.S.C. § 334.

type of suit.[4] Due process, however, speaks to more than just pre-seizure procedures. It is to the adequacy of the post-seizure procedures that the Court must turn its attention.

In *Hutchinson v. Bank of North Carolina*, 392 F.Supp. 888 (M.D.N.C.1975) (three-judge court), the Court had the occasion to review the recent Supreme Court decisions in the pre-judgment attachment area. In making the review, the Court found that the overriding consideration in judging the constitutional adequacy of the statutory procedures is the balancing of the need to protect legitimate creditor's remedies with the need for procedures to minimize the risk that the ex parte issuance of a writ will result in a wrongful or arbitrary deprivation of property. In *Hutchinson*, the Court found that three procedural factors were important in minimizing the risk of a wrongful deprivation of property: (1) Requirement that the affidavit used to obtain the writ of attachment clearly set forth facts supporting the need for the attachment; (2) review by judicial officer of the affidavit before issuance of the writ; and (3) a provision entitling the debtor to get an immediate hearing after seizure and dissolution of the writ absent a showing by the creditor of at least probable cause for the writ.

The role of the third factor was qualified somewhat by the recent Supreme Court decision in *Commissioner v. Shapiro*, 424 U.S. 614, 96 S.Ct. 1062, 47 L.Ed.2d 278 (1976). In *Shapiro*, the Internal Revenue Service seized, without a hearing or notice, all of a taxpayer's liquid assets through use of the jeopardy assessment procedure. In the face of the government's contention that it was entitled to seize and hold properly on merely a good faith allegation, the Court said that, at least where irreparable injury may result from a deprivation of property pending a final adjudication of the rights of the

parties, due process requires that the party whose property is taken be given an opportunity for some kind of pre-deprivation or prompt post-deprivation hearing at which some showing of the probable validity of the deprivation must be made. 424 U.S. at 629, 96 S.Ct. 1062.

Applying these standards, the Court finds that the procedures used by the government in this case are deficient with respect to each of these procedural safeguards.

■ As stated previously in connection with the Fourth Amendment discussion, the government was able to obtain a warrant of seizure from a deputy clerk of this Court simply by filing its complaint. The complaint contained only the conclusory allegation that the property to be seized was a "banned hazardous substance" within the meaning of § 1261(q)(1)(A). Pursuant to Rule C(3), the warrant of seizure was issued by a deputy clerk of court who had no discretion to refuse to issue the warrant. Thus, the warrant's issuance was never subjected to scrutiny by a judicial officer prior to its issuance.[5]

■ As to the third procedural factor, the *Shapiro* decision suggests that Troxler is entitled to a prompt post-seizure hearing to challenge the validity of the seizure if Troxler will suffer irreparable injury pending the outcome of the condemnation suit. The affidavits filed by Troxler establish that the seized goods comprise approximately ninety-five per cent of its retail inventory. The affidavits also establish that because of the short-term financing the company uses and its current financial condition, the seizure will result in the possible insolvency of Troxler and its major shareholders. The Court believes that such an injury to Troxler and its shareholders would constitute irreparable injury, especially in light of the fact that Troxler would receive no compensation from the government for these injuries should the govern-

4. *Fuentes v. Shevin*, 407 U.S. 67, 92 n. 27, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); *Mitchell v. W. T. Grant Co.*, 416 U.S. 600, 611–612, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974).

5. Unlike the North Carolina county clerk of court who was found to be a judicial officer in *Hutchinson, supra*, the deputy clerk of federal district court is not a judicial officer, at least for purposes of issuing a warrant under Rule C.

ment fail to prove its case. Due process would require that Troxler be entitled, at least, to a prompt post-seizure hearing to test the validity of the government's action.[6] However, unlike the procedures upheld in the *Hutchinson* and *Mitchell* cases, neither the admiralty procedures employed by the government nor the usual Rules of Civil Procedure entitle Troxler to an immediate hearing after seizure, and dissolution of the warrant absent a showing by the government of at least probable cause for the warrant.

Because procedural due process is, in the last analysis a matter of fundamental fairness, the Court believes that two other matters are appropriate for consideration in determining whether the procedures employed by the government in this case accord Troxler with due process. The first is the breadth of the scope of the Federal Hazardous Substances Act. Other federal statutes that provide for seizure have a much more circumscribed scope. Under these statutes the seizable items are contraband or other goods which are readily identifiable as within the meaning of those statutes.[7]

Under the FHSA's statutory definition of "banned hazardous substance," goods liable to seizure do not have easily discernible characteristics, but are seizable because of their possible effects which will often be far from easily ascertainable. The broad reach of the FHSA is pointed out by the Commission's attempts by regulation to bring within the meaning of the term "hazardous substance" such varied goods as aerosol sprays,[8] "clacker ball" toys,[9] and bicycles that have fewer than ten reflectors.[10] In light of the ill-defined scope of the statute, it is particularly appropriate that the Commission seek to clarify, by rule-making, what are hazardous substances under the FHSA. Given the vagueness of the statutory definition of banned hazardous substance, a seizure in which the Commission relies on the general statutory definition is more likely to result in a wrongful or arbitrary deprivation of property than a seizure in which the Commission relies on clearly defined regulations. Because, as previously stated, the overriding consideration in judging whether due process has been accorded is whether the procedures minimize the risk of wrongful or arbitrary deprivation, there is a greater need for procedures in situations like the present one where rule-making has not been conducted.

Secondly, the Court feels that the Commission's prior action concerning TRIS casts a shadow on the seizure action in this case. In *Springs Mills*, Judge Chapman conducted an exhaustive and devastating examination of the Commission actions concerning TRIS-treated products and concluded:

"It is evident from the methods used by, as well as the legal procedures avoided by, CPSC in the *Pactra* case and in the present case that the Commission does what it pleases with little concern for the

---

**6.** The Court notes that in the usual admiralty case, the availability of release bonds would prevent the claimant's loss from being characterized as irreparable. Thus in the usual admiralty case, due process would probably not require a prompt post-seizure hearing.

**7.** *See*, 15 U.S.C. § 292 (gold or silver with words "United States assay" or similar words); 15 U.S.C. § 1177 and 18 U.S.C.A. § 1955 (gambling devices); 39 U.S.C. § 604 (mailable letters carried by private carriers); 18 U.S.C. § 492 (counterfeit coins, obligations or securities, or counterfeiting apparatus or materials); 18 U.S.C. § 924 (illegal firearms as defined in 18 U.S.C. § 291); 18 U.S.C. § 3615 (illegal liquor, containers, and vehicles and vessels used in transporting it); 16 U.S.C. § 852d (fish transported contrary to state or foreign law); 49 U.S.C. § 782 (vessels, vehicles, or aircraft

transporting narcotic drugs, illegal firearms, counterfeit coin, government obligations or securities, or counterfeiting apparatus or materials); 7 U.S.C. § 1595 (seed violating statutory provisions of the Federal Seed Act); 7 U.S.C. § 135g (economic poisons determined by the Secretary of Agriculture by regulation).

**8.** *Pactra Industries v. Consumer Product Safety Commission*, 555 F.2d 677 (9th Cir. 1977).

**9.** *United States v. An Article consisting of 50,000 Boxes of Clacker Balls*, 413 F.Supp. 1281 (E.D.Wis.1976).

**10.** *Forester v. Consumer Product Safety Commission*, 182 U.S.App.D.C. 153, 559 F.2d 774 (1977).

restrictions or limitations placed upon it by the Congress or the Constitution. These continuing acts are classic examples of the arrogance of bureaucracy and the abuse of power. They are confirmation of Justice Frankfurter's warning in *McNabb v. U. S.,* 318 U.S. 332, 347, 63 S.Ct. 608, 87 L.Ed. 819 (1943): 'The history of liberty has largely been the history of observance of procedural safeguards.' " 434 F.Supp. at 434.

In addition to the reasons mentioned by Judge Chapman, adherence to rule-making procedures has the added benefit of improving the quality of administrative decision making in what is, at best, a murky area. The Commission's past record of ex parte decision making and its continued refusal to engage in rule-making with regard to TRIS-treated garments, casts doubt on the likelihood that the Commission would succeed on the merits if this case was eventually brought to trial. In the Court's view, these facts serve to emphasize the need to provide more procedural protection than Troxler has been afforded in the present seizure action.

The important policy underlying the FHSA of protecting the public's health and safety is not compromised by requiring greater procedural safeguards than afforded in the case at hand. As previously noted, the government could have obtained its warrant of seizure after submitting its complaint for judicial inspection of its validity and after providing the Court with affidavits that clearly set forth facts supporting the need for the seizure. Although under the peculiar facts of this case, due process requires that Troxler be given a prompt post-seizure hearing which cannot be provided as a matter of right under the § 1265 seizure procedures, the Commission has another avenue it can take to protect what it considers to be the public interest. The Commission is free to file suit under 15 U.S.C. § 1267 for an injunction against Troxler. Such an action by the Commission would provide Troxler with important procedural rights which the Commission's action in the current suit has denied Troxler.

For the foregoing reasons, the Court concludes that the warrant of seizure should be quashed because the procedures employed by the Commission in this case violate Troxler's rights under the Fourth and Fifth Amendments.