**UNITED STATES of America,**
**Petitioner,**

v.

**TROXLER HOSIERY CO., INC.,**
**Respondent.**

**No. 78–1066.**

United States Court of Appeals,
Fourth Circuit.

Argued Jan. 5, 1982.
Decided Feb. 16, 1982.

See also, 4th Cir., 681 F.2d 934.

---

John R. Fleder (J. Patrick Glynn, Gerald C. Kell, Robert B. Nicholson, Dept. of Justice, Washington, D. C., on brief), for petitioner.

---

Edwin E. Boone, Jr., Greensboro, N. C., Robert C. Cone, J. Howard Coble, Greensboro, N. C., for respondent.

Before WINTER, Chief Judge, WIDENER, Circuit Judge, and WILKINS,* District Judge.

PER CURIAM:

In this proceeding, Troxler Hosiery Co., Inc. (Troxler) has been charged with criminal contempt for willfully disobeying an order of this court in a case styled *United States of America v. Articles of Hazardous Substance and Troxler Hosiery Co., Inc.*, No. 78–1066, in violation of 18 U.S.C. § 401(3). The court designated Honorable John A. Field, Jr. to consider and decide preliminary motions of the parties, to conduct any pretrial conferences, to conduct an evidentiary hearing and to report to the court for its consideration proposed findings of fact and recommendations for disposition of the matter. Judge Field has carried out the functions delegated to him and has filed a Report and Proposed Findings of Fact recommending that Troxler be found guilty as charged. The matter is now before us on exceptions to the Report and Proposed Findings of Fact. The government filed no exceptions. Troxler Hosiery Co., Inc. filed thirty exceptions. The exceptions have been fully briefed and argued.

We have considered the report, the exceptions thereto, and the written and oral arguments with respect to the exceptions. In addition we have made an independent examination of the record made before Judge Field. We are satisfied that Judge Field found the facts correctly and we adopt his findings, a copy of which is appended to this opinion, as our own.** We are further satisfied that Judge Field made a correct legal determination of this case in recommending what we should decide. Based

upon our findings and our perception of the applicable law, we conclude that Troxler is guilty of criminal contempt as a result of its willful disobedience of the order of this court entered on March 8, 1978 (continuing an order of Judge Winter filed February 6, 1978), in violation of 18 U.S.C. § 401(3).

There remains only the question of the appropriate penalty to be imposed. We request the government to make a recommendation in writing in that regard within thirty days from the date that this opinion is filed. Troxler shall have the right to respond thereto within fifteen days after service of the government's recommendation on its counsel. If requested by Troxler, we will hear oral argument before pronouncing sentence.

IT IS SO ORDERED AND ADJUDGED.

APPENDIX

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

NO. 78–1066

UNITED STATES OF AMERICA,

Petitioner,

versus

TROXLER HOSIERY CO., INC.,

Respondent.

TO: Honorable Harrison L. Winter, Chief Judge
Honorable H. Emory Widener, Circuit Judge

REPORT AND PROPOSED
FINDINGS OF FACT

Pursuant to your designation I took evidence in this proceeding in Greensboro, North Carolina on September 1, 1981, and based upon the testimony of the witnesses together with the exhibits, I recommend the following findings of fact.

---

* Honorable William W. Wilkins, Jr., United States District Judge for the District of South Carolina, sitting by designation.

** In a postargument motion, Troxler Hosiery Co., Inc. has sought, pursuant to Rule 23(c),

F.R.Crim.P., to have us find the facts specially. We think that Judge Field's report which we adopt as our own fully satisfies the requirements of Rule 23(c).

### 1.

Troxler Hosiery Co., Inc., (Troxler) is a corporation organized under the laws of North Carolina with its principal place of business being located in Greensboro, North Carolina. From the time of its incorporation until, at least, the latter part of the year 1979, Robert Andrew Troxler was president of the corporation and made all of its policy decisions.

### 2.

On November 11, 1977, Troxler entered into a written agreement to buy Tris-treated merchandise from the Greensboro Manufacturing Company. The contract provided that Troxler purchased these goods with full knowledge that they had previously been subjected to a ban order by the Consumer Product Safety Commission and might be subjected to a similar ban at some future date. However, Troxler was aware that the United States District Court for the District of South Carolina had enjoined the Commission from enforcing the regulation banning such Tris-treated goods because the Commission had failed to follow the statutory requirements incident to the adoption of its regulation. Under its purchase agreement Troxler paid a total of $200,000 and received 29,890.75 dozen units of Tris-treated sleepwear. The sleepwear was ultimately recorded as inventory on Troxler's books and all transactions relating to the sleepwear were recorded on Troxler's records. With the exception of this transaction, Troxler obtained no other Tris-treated sleepwear or children's garments.

### 3.

On January 18, 1978, the United States filed a complaint for forfeiture pursuant to Section 6(a) of the Federal Hazardous Substances Act, 15 U.S.C. § 1265(a), against articles of Tris-treated children's sleepwear, asking the United States District Court for the Middle District of North Carolina to decree the condemnation of these goods. *United States v. Articles of Hazardous Substance, etc.,* 444 F.Supp. 1260, (M.D.N.C.). On the same day, the Clerk of the District Court issued a warrant of seizure and monition directing the United States Marshal to seize the goods described in the complaint.

Pursuant to the warrant of seizure, on January 18, 1978, the Marshal placed under seizure 117,284 units (or 9,733⅔ dozen) of children's sleepwear located inside the warehouse of Troxler Hosiery Co. and in the possession of Troxler. The articles seized consisted of sleepwear for babies, small girls and boys. On the date of the seizure, there were additional Tris-treated garments owned by Troxler and located in trailers in Troxler's parking lot; the additional garments were not seized.

### 4.

On January 27, 1978, the Honorable Eugene A. Gordon, United States District Judge for the Middle District of North Carolina, granted a motion filed by Troxler which sought to quash the warrant of seizure. The court ordered the Marshal forthwith to restore the seized articles to Troxler. Pursuant to the court's order, the Marshal's office entered Troxler's warehouse on January 27, 1978, and released the seized articles by removing signs and notices which had evidenced the seizure.

### 5.

On August 17, 1979, Judge Gordon directed the Marshal to enter Troxler's business premises in Greensboro and take an inventory to determine which, if any, of the articles previously seized were still located on the premises. In accordance with that directive, on August 20, 1979, personnel from the Marshal's office went to Troxler's premises, entered the warehouse, and determined that none of the previously seized goods were on the premises. Deputy Marshal Rich observed the area where the seized goods had been and determined that the goods were no longer there.

### 6.

On January 31, 1978, an appeal by the United States from the district court's January 27, 1978 Order was docketed with this Court, No. 78–1066. The United States filed a motion which sought a stay pending appeal of the district court's Order. The government also sought an injunction prohibiting Troxler, pending appeal, from sell-

ing or otherwise disposing of the previously seized garments.

The government's motion was actually submitted to Judge Winter on January 30, 1978, the day before the appeal was docketed in the clerk's office, as was Troxler's response and an affidavit of Robert Andrew Troxler. Mr. Troxler stated in his affidavit that the company, the owner of the seized sleepwear, intended to export all of the merchandise to foreign countries.

On February 2, 1978, Judge Winter issued a Memorandum and Order addressing the government's motion. A copy of the Memorandum and Order was sent on that date to Norman Smith, Esquire, counsel for Troxler. Judge Winter's Memorandum and Order was filed in the Fourth Circuit clerk's office on February 6, 1978.

In his Memorandum and Order, Judge Winter granted the United States' motion for stay under the terms and conditions set forth in the Memorandum and Order, with the stay to continue in effect until oral argument of the appeal. The Order read in pertinent part:

2. Troxler, its officers, servants and employees may negotiate a sale of the seized goods with a foreign purchaser, but no binding contract for a sale shall be made, nor may the sale be consummated until further order of court.

3. Troxler, its officers, servants and employees may place the seized goods in shipping packages for the purpose of exporting it to foreign countries, and to brand and label said packages in accordance with the specification of a foreign purchaser, the law of the foreign countries to which said goods are intended to be shipped, and to indicate on the outside of the shipping packages that they are intended for export. Troxler, however, may not remove said goods from the jurisdiction of the district court until further order of court, and in no event may Troxler sell any of said goods in the domestic market.

Within a day or two after entry of Judge Winter's Order, a copy of the Order was received by Troxler's counsel, Norman

Smith. Mr. Smith thereafter communicated the order to Robert Andrew Troxler, and had discussions with Mr. Troxler regarding the Order.

7.

In his Memorandum and Order, Judge Winter also partially remanded the seizure action to the district court, requesting Judge Gordon's views as to whether Troxler should be permitted to export the seized goods in the event that the goods were condemned pursuant to the Federal Hazardous Substances Act. In this regard, Judge Winter noted that Troxler's counsel had advised him that Troxler would offer no proof to show that the seized garments were not banned hazardous substances if the government prevailed on its appeal of the order quashing the warrant of seizure.

On February 21, 1978, Judge Gordon issued a Memorandum Decision in which he concluded that he did not have the authority, under 15 U.S.C. § 1265(c), to permit goods which are condemned under the Hazardous Substances Act to be released for export. Judge Gordon's decision was received by Troxler's counsel, as evidence by Troxler's notice of appeal of the decision filed on February 24, 1978. Personnel at Troxler were also aware of Judge Gordon's decision.

8.

The appeal in No. 78–1066 was orally argued before a panel of this Court consisting of Judges Winter, Field and Widener on March 6, 1978. Two days later, on March 8, 1978, this Court, at the direction of Judge Winter, with the concurrence of Judge Field and Judge Widener, ordered that the February 6, 1978 stay of the district court's Order was continued until the Court rendered a final decision in the case. A docket sheet entry indicates that a certified copy of this Order was mailed to Norman Smith, Esquire, Troxler's counsel. Mr. Smith received the March 8, 1978 Order within a few days after it was entered and communicated the Order and its contents to Robert Andrew Troxler.

**9.**

On October 30, 1978, this Court reversed the district court's quashing of the warrant of seizure and remanded the case for further proceedings. This decision is reported at 588 F.2d 39. Between March 8, 1978, and October 30, 1978, this Court issued no order which in any way modified or withdrew its prohibition of the removal of the seized goods from the Middle District of North Carolina.

**10.**

As previously noted, Troxler Hosiery Company received a total of 29,890.75 dozen garments from Greensboro Manufacturing Company. These were the only sleepwear ever acquired by Troxler. The evidence shows that prior to the shipment of the sleepwear to Venezuela, which the government contends constituted contempt of this Court's Orders, Troxler had sold 7,644¾ dozen units of the sleepwear. There is no evidence that any of these goods were among those seized by the Marshal on January 18, 1978. The total number of garments acquired by Troxler, minus the 7,644¾ dozen disposed of other than to Venezuela, leaves a total of 22,246 dozen garments. This is the exact number of garments which Troxler's own records show were shipped to Venezuela. Inasmuch as none of the 7,644¾ dozen garments were among those seized, it necessarily follows that the 22,246 dozen garments shipped to Venezuela included garments seized by the Marshal, which this Court had forbidden to be removed from the Middle District of North Carolina.

**11.**

In a complaint filed by Troxler against the United States in the Middle District of North Carolina on April 11, 1980, Troxler stated that it had been forced to export the Tris-treated sleepwear in an attempt to avoid serious financial reversals. This admission in the complaint was corroborated by the evidence presented by the government. The export of the sleepwear was arranged by Robert Andrew Troxler approximately two months after the order of this Court entered on March 8, 1978. To accomplish an overseas disposition of the sleepwear, Troxler requested that Theodore Samet put him in touch with a Venezuelan businessman named Sayed Antar and his broker, Norman Kravis. In discussion with Mr. Samet, Mr. Troxler asked that he arrange a meeting with Kravis and Antar for the purpose of determining whether they would purchase the sleepwear. Thereafter, Mr. Samet did put Mr. Troxler in touch with those individuals.

In May 1978, Mr. Troxler contacted Mr. Charles Pinkleton who arranged for Charles Sampson to haul merchandise for Troxler to Miami, Florida. Sampson went to a paper company in Greensboro where he saw Mr. Troxler and observed children's pajamas wrapped in cellophane being loaded onto Sampson's trailer. After the goods were loaded, Sampson went to the office of Troxler where he was given a bill of lading which described the goods as rags for conversion and directed that they be taken to Dodge Island, Florida to be loaded onto a boat. Sampson's truck was driven by his son-in-law, Larry Lohr, to Dodge Island. Lohr observed the truck being unloaded and saw that the goods were, in fact, children's sleepwear.

**12.**

In the spring of 1978, Robert Troxler contacted Edward Steele and asked him to take two truckloads of goods to Miami. Steele made arrangements for the two trucks, and thereafter Troxler asked him if he could arrange for a third load to be taken to Florida and Mr. Steele made the necessary arrangements. Steele was given a check as part payment for the three loads and the check was drawn on the account of Troxler Hosiery Company, Inc. The driver of one of Steele's trucks, Larry Sprinkle, noticed that the bill of lading given to him by Troxler for the shipment bore a date of March 8, 1978 and, accordingly, was incorrect by two months since the shipment was made in May 1978. Another of Steele's drivers, Alvie Glynn Roy, also noticed a discrepancy of some two months between the bill of lading and the date his trip to Florida actually took place.

**13.**

Robert Andrew Troxler arranged for Rex Air Freight, Inc. to accomplish the transfer of the goods at Dodge Island from the trucks in which they had been transported from North Carolina to a Venezuelan shipping company for transport to Venezuela. Mr. Troxler's contact at Rex Air Freight was Xonia Torres. Mr. Troxler signed a Rex Air Freight shipper's letter of instructions on May 8, 1978, this document being typed at Rex Air Freight's office. The date on the document was May 8, 1978, and the instructions state that the shipper was sending 25,000 dozen of children's clothing valued at $156,250 in four forty-foot trailers. The goods were destined to go to Importadora Laura, Porlamar, Isla De Margarita, Venezuela.

On May 8, 1978, Mr. Troxler notified S.E.L. Maduro, Inc. that he was shipping 25,000 dozen of pajamas to Margarita Island, Venezuela. At the evidentiary hearing, Maduro produced a master bill of lading prepared by Rex Air Freight which shows that on May 11, 1978, children's clothing was shipped via the vessel M.V. Stefi with a destination of Porlamar, Isla Margarita, Venezuela.

Richard Duda, an employee of Maduro, checked two trailerloads of children's sleepwear, the shipments having originated in Greensboro, North Carolina and destined for South America. The sleepwear was encased in plastic and appeared to be new merchandise, and the dates placed on the bills of lading by Mr. Duda indicating his receipt of the shipments were May 8 and 9, 1978, respectively.

**14.**

Maurice Polk, who had been the accountant for Troxler for some 15 years, determined that over 22,000 dozen of garments were no longer in Troxler's possession and Robert Andrew Troxler informed Polk that the Tris-treated garments had been shipped to Venezuela. Polk prepared a financial statement for Troxler Hosiery which reflected that as of June 30, 1978, $141,025 worth of sleepwear was located in Caracas, Venezuela. Nancy Lawson, Office Manager and Bookkeeper for Troxler, noticed that the Tris-treated merchandise disappeared from the warehouse over one weekend, and Mr. Troxler advised her that the merchandise had been sent to Venezuela.

## CONCLUSION

To be found guilty of criminal contempt under 18 U.S.C. § 401(3), a person must willfully disobey or resist a lawful writ, process, order, rule, decree, or command previously issued by a court of the United States. This Court's Order filed on February 6, 1978, which was continued by Order of the Court on March 8, 1978, prohibited Troxler Hosiery Company from removing previously seized sleepwear from the Middle District of North Carolina. The evidence shows that Troxler's counsel and its president, Robert Andrew Troxler, received notice of these Orders shortly after they were issued. The evidence further shows that in early May 1978, Troxler removed most, if not all, of the 9,773⅔ dozen garments seized by the Marshal on January 18, 1978, from the Middle District. The evidence establishes that the manner in which Troxler handled the shipments, including the false dating of the bills of lading, were designed to make it appear that the removal of the sleepwear from the Middle District of North Carolina occurred at a time when no Order of this Court prevented such a removal. Accordingly, the Government has proved beyond a reasonable doubt that Troxler Hosiery Co., Inc. is guilty of criminal contempt.

Respectfully submitted.

/s/ John A. Field, Jr.
Senior United States Circuit Judge