UNITED STATES of America, Petitioner,

v.

TROXLER HOSIERY CO., INC., Respondent.

No. 78–1066.

United States Court of Appeals, Fourth Circuit.

Argued May 27, 1982.
Decided June 21, 1982.

John R. Fleder, Washington, D. C. (J. Patrick Glynn, Gerald C. Kell, Robert B. Nicholson, Dept. of Justice, Washington, D. C., on brief), for petitioner.

Edwin E. Boone, Jr., Robert C. Cone, J. Howard Coble, Greensboro, N. C., for respondent.

Before WINTER, Chief Judge, WIDENER, Circuit Judge, and WILKINS,* District Judge.

HARRISON L. WINTER, Chief Judge:

On February 16, 1982 we adjudged Troxler Hosiery Co., Inc., (Troxler) guilty of criminal contempt, in violation of 18 U.S.C. § 401(3), for willfully disobeying an order of this court in a case styled *United States v. Troxler Hosiery Co., Inc.*, 672 F.2d 365 (4 Cir. 1982). Briefly stated, the contempt was committed when, despite the knowledge of its attorney and its president, Robert Andrew Troxler, that our order filed February 6, 1978 and continued on March 8, 1978 prohibited Troxler from removing previously seized sleepwear from the Middle District of North Carolina, Troxler removed most, if not all, of the 9,773.66 dozen garments in violation of the order. We invited the government to make a recommendation with regard to punishment, giving Troxler the right to respond thereto and to request oral argument. The matter has been heard at Troxler's request, and the papers and arguments, both written and oral, thoroughly considered.

I.

Despite its request for a jury trial, Troxler was tried and found guilty of criminal contempt without the intervention of a jury, and we are met at the outset with the contention that our authority to punish for criminal contempt, unlimited by the terms of 18 U.S.C. § 401, is narrowly circumscribed by the failure to grant a jury trial.

The Sixth Amendment right to a jury trial [1] applies to criminal contempt pro-

---

* Honorable William W. Wilkins, Jr., United States District Judge for the District of South Carolina, sitting by designation.

1. The government asserts, without supporting authority, that a corporation has no Sixth Amendment rights. The government appears to be confusing the Fifth with the Sixth Amendment. A corporation does not have the

ceedings to the same extent that it does to any other criminal proceeding; "petty" contempts may be tried without a jury, but contemnors in serious contempt cases in the federal courts have a right to a jury trial. *Muniz v. Hoffman*, 422 U.S. 454, 475–476, 95 S.Ct. 2178, 2190, 45 L.Ed.2d 319 (1975).

■ One criterion for determining whether a criminal offense is serious is the intrinsic nature of the crime charged, regardless of the authorized punishment. *See Callan v. Wilson*, 127 U.S. 540, 555–557, 8 S.Ct. 1301, 1306–1307, 32 L.Ed. 223 (1888). But criminal contempt, in and of itself, or without regard to the punishment imposed, is not a serious offense. *Muniz v. Hoffman*, 422 U.S. at 476, 95 S.Ct. 2190.

■ A criminal offense may also be characterized in terms of the punishment imposed on the offender, and should be regarded as serious if the maximum authorized penalty for the offense is serious. *See Baldwin v. New York*, 399 U.S. 66, 68, 90 S.Ct. 1886, 1887, 26 L.Ed.2d 437 (1970). In cases in which the defendant is charged with criminal contempt for which no maximum penalty is prescribed by statute, the gravity of the offense and, therefore, the determination of whether the contemnor has a right to a jury trial must be determined according to the actual punishment imposed. *Frank v. United States*, 395 U.S. 147, 149, 89 S.Ct. 1503, 1505, 23 L.Ed.2d 162 (1969).

The Supreme Court has adopted a "bright line" test for determining whether a term of imprisonment imposed on a contemnor is serious or petty. If less than six months imprisonment is imposed, the contempt is deemed to be petty; if greater than six months, the contempt is serious. *See Muniz v. Hoffman*, 422 U.S. at 476, 95 S.Ct. at 2190. In adopting this rule, the Court relied on 18 U.S.C. § 1, which defines petty offenses as those for which the punishment is less than six months imprisonment or a fine of not more than $500, or both. *Id.* at 476–477, 95 S.Ct. at 2191. However, in *Muniz*, the Court refused to characterize a criminal contempt as serious where only fiscal sanctions were imposed, despite the fact that the fine imposed on a labor union was $10,000, thereby deciding that the provisions of 18 U.S.C. § 1 with respect to the maximum permissible fine for a federal petty offense do not necessarily define petty and serious for Sixth Amendment purposes. In *Muniz*, the government argued that there is no constitutional . right to a jury trial in any criminal contempt case when only a fine is imposed on a corporation or labor union. The Court did not reach that issue, but decided only that the fine of $10,000 imposed in the case at bar was not a "deprivation of such magnitude that a jury should have been interposed to guard against bias or mistake." *Muniz v. Hoffman*, 422 U.S. at 477, 95 S.Ct. at 2191. *See also Musidor, B.V. v. Great American Screen*, 658 F.2d 60, 66 (2 Cir. 1981) (authorizing a $10,000 fine against a corporation found guilty of criminal contempt despite the fact that jury trial had not been waived).[2]

---

same right not to incriminate itself as does a natural person, but it does enjoy the same rights as individuals to trial by jury. *United States v. R. L. Polk and Co.*, 438 F.2d 377, 379 (6 Cir. 1971).

**2.** The courts have rejected an interpretation of *Muniz* which would allow a fine over $500 against an individual contemnor, holding instead that no fine can be imposed over $500 against an individual without a jury trial or a waiver of the right. *United States v. Hamdan*, 552 F.2d 276, 280 (9 Cir. 1977); *Douglass v. First National Rlty. Corp.*, 543 F.2d 894 (D.C. Cir.1976). In *Hamdan*, the court explained that its holding was not contrary to *Muniz* because,

*inter alia*, it is not unreasonable to assume that any individual considers a fine over $500 as a serious matter. 552 F.2d at 279–280. In addition, the court in *Hamdan* extolled the benefits of adopting a "bright line" test for measuring the seriousness of the offense rather than attempting to measure the "seriousness of the deprivation"—uniformity, objectivity, and practical judicial administration. 552 F.2d at 280.

Nonetheless, it appears that, when a corporation is the contemnor, *Muniz* requires that the right to a jury trial be gauged, somehow, according to the ratio of the fine imposed and the defendant's ability to pay.

We therefore proceed on the premise that, notwithstanding the denial of a jury trial, we are limited in imposing a fine only to the extent that it is of such magnitude as to constitute a serious deprivation on Troxler. For the reasons, largely factual, which follow, we do not think that we stray into the prohibited area.

## II.

The government asserts that Troxler could generate the funds to pay a fine of $100,000–$110,000 (the range of punishment that it recommends), without disruption of its ongoing business operations and therefore without serious hardship, by (1) realizing the net cash surrender value on certain life insurance policies on the life of its president in the amount of $8,000, (2) selling certain investment rental property having a value of approximately $90,000 after payment of an outstanding mortgage, and (3) selling the sleepwear, illegally removed from the Middle District of North Carolina and sent to Venezuela, for its cost ($61,085.44) plus the profit ($15,271.36) it has contracted to receive from its Venezuelan agent who is authorized to sell the goods.

Troxler vehemently contests its ability to pay such a fine. It claims that, as per its balance sheet, its liabilities exceed its assets, and it has incurred substantial operating losses, largely as a result of the purchase of the sleepwear, a part of which was seized, and the cost of money to finance the purchase over the last four years.[3] It does not seriously dispute, however, that its investment real property is carried on its books at original cost and that the present market value of the property is substantially in excess of that amount. Its balance sheet shows the cash surrender value of the life insurance in excess of policy loans in the amount of approximately $10,000. It is quite clear, also, that Troxler purchased the sleepwear at a time that it had full knowledge that the government considered it a health hazard, had previously banned it and might take legal action against such goods again.

Of the 29,890.75 dozen sleepwear garments purchased by Troxler for a total sum of $200,000, 7,644.75 dozen were sold. Of the remainder (22,246 dozen), 9,773.66 dozen were seized. After seizure and the entry of our orders, Troxler sent the entire 22,246 dozen to Caracas, Venezuela under an agreement with a Venezuelan agent to sell the sleepwear and remit 25 percent of the profit realized from the sale to Troxler. The sleepwear sent to Venezuela which was subject to our orders cost Troxler $61,085.44, and it expected to make a profit of $15,271.36, a total of $76,356.80.

What has happened to the previously seized sleepwear that was sent to Venezuela is far from clear. Troxler, through the affidavits of its officers, claims that it has received nothing from the sale of any sleepwear in Venezuela, and that it considers the merchandise a total loss, although it has not written off its purchase of the sleepwear (carried as a current asset of $144,716) from its books for fear of causing panic to its other creditors. However, in a statement to an agent of the FBI, one of the officers making such an affidavit, in the presence of the other, expressed his belief that some of the sleepwear had been sold in Venezuela, that if some goods are still there, and it has become illegal to sell them in Venezuela, it might be possible to sell them elsewhere, but that he would make no effort to do so if he were required to remit the proceeds to the government.[4]

On the present record, we think it more likely than not that Troxler will realize some part or all of the value (including

---

**3.** The government's proof, however, showed that Troxler had a net worth of approximately $540,000.

**4.** During oral argument, Troxler moved to suppress the report of this statement. The statement was made by Robert Andrew Troxler, Sr., Chairman of the Board, in the presence of Robert Troxler, Jr., President, when the two came to the office of the United States Attorney to deliver certain books and records relating to Troxler's financial condition. There is no evidence that the statement was other than voluntary or that the government was guilty of overreaching. We deny the motion.

profit) on the sleepwear that was sent to Venezuela in willful defiance of our orders. In fixing the fine to be imposed, we proceed from that premise. Of course we also consider the nature of the contemptuous conduct—not only that our orders were willfully disobeyed, but that records were falsified to conceal the disobedience and that Troxler in a verified pleading moved the district court for a return of the goods at a time that it knew that it had removed them from the jurisdiction of the court. We are mindful that in fixing the penalty, we must, within Troxler's ability to pay, not only punish Troxler for its conduct but deter others from such willful disobedience.

We think it fair and just that Troxler be deprived of any return on any of the sleepwear which was seized and that it suffer some fiscal punishment in addition. The latter need not be great because Troxler has already been punished in part by the substantial legal fees that it has incurred and by its expenses, including interest on funds it borrowed to finance the acquisition of the sleepwear, as a result of the transaction. With regard to deprivation of any return on the seized sleepwear, should Troxler arrange for its destruction before a responsible representative of the government or should Troxler be able to adduce substantial persuasive proof to demonstrate that it has realized nothing or less than the amounts estimated by the government from the sale or other disposition of the sleepwear, Troxler may move for a reduction of sentence under and in accordance with the time limitations contained in Rule 35, Fed. R.Crim.P.

### III.

It is our judgment that Troxler be sentenced to pay a fine of $80,000 and costs, payment in full to be made within twelve months from the date of the judgment order.

The Clerk is directed to prepare and file forthwith a judgment order embodying the foregoing fine and time of payment.