**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**James D. SODERNA, et al.,
Defendants–Appellants.**

Nos. 95–1309, 95–1333, 95–1430, 95–1488 and 95–1494.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 23, 1996.

Decided April 30, 1996.

Matthew L. Jacobs, Office of the U.S. Attorney, Milwaukee, WI, Jessica Dunsay Silver, Eileen Penner (argued), Dept. of Justice, Civil Rights Div., Appellate Section, Washington, DC, for U.S. in Nos. 95–1309 and 95–1494.

Eugene R. Pigatti, Fiorenza & Hayes (argued), Milwaukee, WI, for James D. Soderna, Colin L. Hudson, Michael Charles Suhy, Dale R. Pultz.

Colleen K. Connell, James A. Huttenhower, Roger Baldwin Foundation of ACLU, Inc., Chicago, IL, for American Civil Liberties Union of Illinois, American Civil Liberties Union Foundation, American Civil Liberties Union of Wisconsin.

Deborah A. Ellis, New York City, Priscilla Smith, Center for Reproductive Law & Policy, New York City, for American College of Obstetricians and Gynecologists, Feminist Majority Foundation, Nat. Abortion Federation, Nat. Abortion and Reproductive Rights Action League, Nat. Center for the Pro Choice Majority, Nat. Organization for Women, Inc., Nat. Women's Law Center, Wisconsin Women's Network, Women's Law Project, Women's Legal Defense Fund.

Matthew L. Jacobs, Office of the U.S. Attorney, Milwaukee, WI, Jessica Dunsay Silver, Eileen Penner (argued), Dept. of Justice, Civil Rights Div., Appellate Section, Washington, DC; Kevin A. Forder, U.S. Dept. of Justice, Civil Rights Div., Criminal Section, Washington, DC, for U.S. in Nos. 95–1333, 95–1430 and 95–1488.

Michael Charles Suhy, Canton, MI, pro se.

Rene L. Wright (argued), Soldotna, AK, for Marilyn R. Hatch.

Before POSNER, Chief Judge, and FLAUM and KANNE, Circuit Judges.

POSNER, Chief Judge.

The defendants appeal from their convictions for violating the Freedom of Access to Clinic Entrances Act of 1994, 18 U.S.C. § 248, raising a variety of constitutional questions. The Act, which already has survived similar constitutional challenges in three other circuits, *United States v. Dinwiddie*, 76 F.3d 913 (8th Cir.1996); *Cheffer v. Reno*, 55 F.3d 1517 (11th Cir.1995); *American Life League, Inc. v. Reno*, 47 F.3d 642 (4th Cir.1995), was passed in the wake of continuing violence against, and other forcible interference with, abortion clinics, their staffs, and their clientele by radical elements of the anti-abortion movement. Murder, arson, kidnappings, bombings and bomb threats, assaults, death threats, trespasses, vandalism, gas attacks, military-style assaults, and blockades of entrances to clinics—a concerted nationwide wave of violence, intimidation, and obstruction that had overwhelmed the local authorities in some areas and that local authorities in other areas were unwilling to take action against—impelled the passage of the Act with strong bipartisan support. See, e.g., S.Rep. No. 117, 103d Cong., 1st Sess. (1993). Although as its title implies the Act is concerned primarily with the protection of abortion clinics, the drafters cast the net of liability wider. The Act for-

bids the use of force or threats of force or physical obstruction deliberately to injure, intimidate, or interfere with people seeking to obtain or to provide any reproductive medical or other health services, not just abortion, and also people seeking to exercise their religious rights in a church or other house of worship. 18 U.S.C. § 248(a). Substantial criminal as well as civil penalties are authorized for violations of the Act; but where the violation "involv[es] exclusively a nonviolent physical obstruction, the fine shall be not more than $10,000 and the length of imprisonment shall be not more than six months, or both, for the first offense." § 248(b). The statutory term "physical obstruction" is defined as "rendering impassable ingress to or egress from a facility that provides reproductive health services or to or from a place of religious worship, or rendering passage to or from such a facility or place of religious worship unreasonably difficult or hazardous." § 248(e)(4).

Early one morning in 1994, the six defendants in our case (one of whom has abandoned his appeal) blockaded the two entrances to an abortion clinic in Milwaukee. Four of the defendants blocked one entrance with a combination of a disabled automobile, a large drum filled with concrete and steel, and their bodies. The automobile was placed on the sidewalk directly in front of the recessed alcove of the entrance; the drum, two of the defendants, and a child occupied the alcove itself. Two other defendants sat on the ground with their bodies extending upright into the car through holes cut in the car's floor, their bodies being attached to the car by handcuffs, welding, and other means. The doors of the car had been welded shut and the car was leaking gasoline. The remaining two defendants were similarly fastened to a station wagon that was blocking the other entrance to the clinic. It took the fire department several hours to take the cars apart, extricate the defendants from the cars without injuring the defendants, and clear the entrances. The defendants offered no resistance; there was no violence; there were no threats of violence, or even displays of anger, on the part of the defendants or their supporters, who were picketing in the vicinity. (All these things are apparent from the videotapes of the incident, which are a part of the record.) But during much of the period in which the fire department was working to clear the entrances, the members of the clinic's staff could not enter the clinic and patients with appointments to have abortions or other procedures or consultations could not be served.

The defendants, all of whom had been arrested for similar conduct in other states, were convicted after a bench trial (their demand for trial by jury having been refused) of physical obstruction of the staff and clientele of the clinic. As first offenders under the Freedom of Access to Clinic Entrances Act convicted only of nonviolent obstruction, the defendants received prison sentences ranging from 30 days to 6 months and fines ranging from $500 to $3,500.

The defendants argue that the Act exceeds the Constitution's grant of authority to Congress to regulate interstate commerce. We rejected the argument in *United States v. Wilson*, 73 F.3d 675 (7th Cir.1995). A number of abortion clinics draw both staff and patients from across state lines (the clinic doctor in this case lives in Illinois, though the clinic is in Wisconsin) and purchase many of their medical and other supplies in interstate commerce, S.Rep. No. 117, *supra*, at 31; and the anti-abortion movement, through tactics such as those prohibited by the Act, has succeeded in curtailing the number and activities of abortion clinics. So this is a statute that really does seek to remove a significant obstruction, in rather a literal sense, to the free movement of persons and goods across state lines. *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964); *Katzenbach v. McClung*, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964). The boycott of a single ophthalmological surgeon was held in *Summit Health, Ltd. v. Pinhas*, 500 U.S. 322, 329–30, 111 S.Ct. 1842, 1846–47, 114 L.Ed.2d 366 (1991), to be within the power of Congress to prevent because of the potential impact on the market for ophthalmological services in Los Angeles. The Court emphasized that the test was not the effect of the particular conduct alleged, but that effect cumulated over all the conduct subject to the statute. *Id.* at

331–32, 111 S.Ct. at 1847–48; see also *Hammes v. AAMCO Transmissions, Inc.*, 33 F.3d 774, 781 (7th Cir.1994). The market in reproductive health services is as large nationwide as the Los Angeles market in ophthalmological services; is as much or more an *interstate* market because of interstate movement of patients, staff, and supplies; and is as likely to be disrupted by the kind of activity in which the defendants in this case engaged as the Los Angeles market in ophthalmological services was likely to be disrupted by the antitrust violations with which the defendant hospital chain was charged.

▪ The fact that the motive for the Freedom of Access to Clinic Entrances Act was not to increase the gross national product by removing a barrier to free trade, but rather to protect personal safety and property rights, is irrelevant. *Heart of Atlanta Motel, Inc. v. United States, supra*, 379 U.S. at 256–57, 85 S.Ct. at 356–58. Congress can regulate interstate commerce for any lawful motive. See, e.g., *Champion v. Ames*, 188 U.S. 321, 356–63, 23 S.Ct. 321, 327–30, 47 L.Ed. 492 (1903) (interstate transportation of lottery tickets); *Pic–A–State Pa., Inc. v. Reno*, 76 F.3d 1294, 1300–03 (3d Cir.1996) (same); *Hoke v. United States*, 227 U.S. 308, 33 S.Ct. 281, 57 L.Ed. 523 (1913) (interstate transportation of prostitutes); *Brooks v. United States*, 267 U.S. 432, 45 S.Ct. 345, 69 L.Ed. 699 (1925) (interstate transportation of stolen cars).

▪ But the defendants also argue that the Act violates the First Amendment. They point out that they blockaded the clinic in order to express their opposition (the sincerity of which is not in question) to abortion, that they did not injure or threaten to injure anybody, and that the First Amendment protects nonverbal as well as verbal expressive activity—protects, for example, the burning of the American flag. *Texas v. Johnson*, 491 U.S. 397, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989); *United States v. Eichman*, 496 U.S. 310, 110 S.Ct. 2404, 110 L.Ed.2d 287 (1990). They do not question the right of government to prevent physical obstruction of access to buildings as well as to prevent violence. They argue

rather that the singling out of abortion clinics for protection against violence and obstruction, and the fact that the Act punishes interference, intimidation, obstruction, and so forth only when it is done "*because* that person [the person interfered with, intimidated, etc.] is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing" an abortion or some other service relating to pregnancy or the reproductive system, 18 U.S.C. § 248(a)(1) (emphasis added), show that the Act's real aim and likely effect are to deter the expression of a particular point of view, namely opposition to abortion. The fact that the protected class was broadened during the passage of the bill through Congress to include all medical and health services related to reproduction (not just abortion), plus places of worship, is, in the defendants' view, a transparent and ignoble figleaf. The statute is, they claim, "obviously" aimed at the anti-abortion movement.

It is not at all clear that the statute is "aimed" at the anti-abortion movement. We should not lightly impugn the motives of legislators. Some staunch opponents of abortion, such as Senator Danforth, were eloquent in support of the bill. See 139 Cong. Rec. S15680 (daily ed. Nov. 16, 1993). It is possible to oppose abortion yet also oppose (and consider counterproductive) not only the murder of abortion doctors but also the blockading of entrances to abortion clinics by tactics described by Judge Coffey, dissenting in the factually identical case of *United States v. Wilson, supra*, as "distasteful or worse." 73 F.3d at 689. With matters of taste we have nothing to do. If taste were a criterion of protected speech, public debate in the United States would be stilled. The Freedom of Access to Clinic Entrances Act is not about bad taste in the marketplace of ideas and opinions. It is about, in Judge Coffey's words, what is "worse" than merely "distasteful"; it is about conduct that, rather than being purely symbolic, like flag-burning, *Texas v. Johnson, supra*, or wearing a black armband, *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), has, like

political assassination, cf. Laurence H. Tribe, *American Constitutional Law* 828 n. 18 (2d ed.1988), physical consequences that are independent of symbolic significance.

■ "[S]ome forms of expression," we wrote in a case involving "cross burning used to intimidate," "are harmful and damaging to others and, as such, do not enjoy the protecting cover of speech in the constitutional sense." *United States v. Hayward*, 6 F.3d 1241, 1250 (7th Cir.1993). The behavior of the defendants in the present case dramatized their opposition to abortion; it was expressive. But it also made it physically impossible (or at least unreasonably difficult) for staff and patients to enter the clinic. To persuade and to blockade are importantly different forms of action, though both are expressive. One operates just on the mind, the other on the body as well. Burning a flag that one has bought and paid for does not prevent anybody from doing anything; it does not interfere with anyone's personal liberty or property rights. Blockading the entrance to a building not your own does both, just as killing a political opponent invades a right of personal liberty at the same time that it makes a political statement, as in the case of John Wilkes Booth's killing of Abraham Lincoln. The distinction is engraved in the case law interpreting the First Amendment. "[A] physical assault is not by any stretch of the imagination expressive conduct protected by the First Amendment.... '[V]iolence or other types of potentially expressive activities that produce special harms distinct from their communicative impact ... are entitled to no constitutional protection.'" *Wisconsin v. Mitchell*, 508 U.S. 476, 484–85, 113 S.Ct. 2194, 2199, 124 L.Ed.2d 436 (1993), quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 628, 104 S.Ct. 3244, 3255, 82 L.Ed.2d 462 (1984).

■ The First Amendment forbids the states to outlaw peaceful nontrespassory picketing, which like flag-burning does not deprive the people whom the picketers are quarreling with, or trying to influence, of their personal liberty or property rights. *Thornhill v. Alabama*, 310 U.S. 88, 98–101, 60 S.Ct. 736, 742–44, 84 L.Ed. 1093 (1940). But the amendment does not extend its protection to the next step, where the picketer physically impedes entry to the picketed premises. E.g., *Cameron v. Johnson*, 390 U.S. 611, 616–17, 88 S.Ct. 1335, 1338–39, 20 L.Ed.2d 182 (1968); *Cox v. Louisiana*, 379 U.S. 536, 553–55, 85 S.Ct. 453, 463–65, 13 L.Ed.2d 471 (1965). "A group of demonstrators could not insist upon the right to cordon off a street, or entrance to a public or private building, and allow no one to pass who did not agree to listen to their exhortations." *Id.* at 555, 85 S.Ct. at 465. "The power and the duty of the State to take adequate steps to preserve the peace and to protect the privacy, the lives, *and the property* of its residents cannot be doubted." *Thornhill v. Alabama*, *supra*, 310 U.S. at 105, 60 S.Ct. at 745–46 (emphasis added). "We thus need not tolerate coercive or obstructionist conduct solely because it serves some passionate ideology or interest." *Pro-Choice Network v. Schenck*, 67 F.3d 377, 395 (2d Cir.1995) (en banc) (concurring opinion joined by majority of the judges), *cert. granted*, —— U.S. ——, 116 S.Ct. 1260, 134 L.Ed.2d 209 (1996). When "specific individuals are targeted at locations difficult or inconvenient for them to avoid, the First Amendment's tolerance of plausibly coercive or obstructionist protest is least." *Id.* at 398. Here the defendants went beyond protest and invaded property rights.

■ The difference between communication and obstruction was well expressed by one of the defendants in this case when he told the judge, "What we did, we weren't there to protest abortion. If I wanted to protest abortion, I would write my Senator or my Congressman. We were there to save innocent human life." The Freedom of Access to Clinic Entrances Act does not close the channels of protest to the right to life movement.

If the government distinguishes arbitrarily among classes of expressive conduct, it may be found (we do not say "will," because we do not have to decide the issue) to be interfering impermissibly with the marketplace in ideas and opinions. If, for example, the Freedom of Access to Clinic Entrances Act made it a felony to assault the employee of an abortion clinic but only a misdemeanor to assault the employee of a pregnancy clinic that urges its

clientele to carry the fetus to term and put up the baby for adoption rather than to have an abortion, it could be argued that the Act violated the First Amendment. Whether the argument would succeed is uncertain in light of cases such as *Wisconsin v. Mitchell, supra,* 508 U.S. at 485–89, 113 S.Ct. at 2200–01; *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), and *R.A.V. v. City of St. Paul,* 505 U.S. 377, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992). In the last of these cases, the Court said that "where the government does not target conduct on the basis of its expressive content, acts are not shielded from regulation merely because they express a discriminatory [or otherwise disfavored] idea or philosophy." *Id.* at 390, 112 S.Ct. at 2546–47. The "ordinance struck down in *R.A.V.* was explicitly directed at expression [namely hate speech] ... [whereas] the statute in this case is aimed, at conduct unprotected by the First Amendment." *Wisconsin v. Mitchell, supra,* 508 U.S. at 487–89, 113 S.Ct. at 2201. Those words could have been spoken of the present case.

If, in our hypothetical case of differential punishment for assaults against employees of abortion clinics versus clinics that promote adoption as an alternative to abortion, the basis for the difference was that there was more violence against employees of abortion clinics than against employees of pregnancy clinics, the difference might be lawful. But this we need not decide. For by broadening, out of an abundance of caution, the protected activity from abortion to reproductive health services, the drafters finessed this particular type of challenge. It is true that the Act is being *enforced* mainly against opponents of abortion. But this is because it is mainly they who are interfering with the provision of pregnancy-related services, just as it was Vietnam War protesters who burned their draft cards. *United States v. O'Brien, supra.* Selective prosecution on invidious grounds, see, e.g., *Wayte v. United States,* 470 U.S. 598, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985); *United States v. Kerley,* 787 F.2d 1147 (7th Cir.1986), is not alleged. A group cannot obtain constitutional immunity from prosecution by violating a statute more frequently than any other group. *Madsen v. Women's Health Center, Inc.,* ——

U.S. ——, ——–——, 114 S.Ct. 2516, 2523–24, 129 L.Ed.2d 593 (1994).

By the same token, the authority of government to criminalize dangerous or destructive conduct is not diminished by the fact that most or even all of the people who engage in the particular conduct sought to be criminalized do so for political reasons. *Id.* at ——, 114 S.Ct. at 2523. Suppose that the only people in the United States who bombed laboratories in which animal research is conducted were members of the Anti–Vivisection League, which had decided that bombing these laboratories is the only effective way of spreading its message. Would the fact that violence was the only effective means of conveying the League's message preclude Congress from passing a law against the bombing of laboratories by persons seeking to impede research on animals? We think not, even though the law would interfere with the marketplace in ideas and opinions by diminishing, even extinguishing (on our hypothetical assumptions), the League's voice.

The vast majority of the millions of Americans who oppose abortion and would like to see restored the state laws struck down in *Roe v. Wade* and the cases following it do not utilize violence or blockades or other illegal tactics disrespectful of personal liberty and property rights to disseminate their message. The Freedom of Access to Clinic Entrances Act will therefore not have the silencing effect on the anti-abortion movement that our hypothetical bombing law would have on the hypothetical Anti–Vivisection League, a silencing effect that nonetheless would not, as we have said, invalidate such a law. Indeed, since many adherents of the right to life movement believe that the movement is harmed rather than helped by violent or confrontational tactics, the Act may assist rather than impede the movement's efforts to persuade those open to persuasion on the issue.

Unless—to come to the second half of the defendants' First Amendment challenge—the Act is so vague that it will deter entirely peaceable protest against abortion. The defendants focus on the statutory definition of "physical obstruction" as including

"rendering passage to or from [an abortion clinic or other facility] unreasonably difficult or hazardous." They express concern that someone who was occupying merely a part of the sidewalk leading to an abortion clinic, or even someone trying to hand an antiabortion leaflet to people going to and coming from the clinic, might be thought to be making passage "unreasonably difficult." But when pressed at argument for suggestions as to how to make the statute clearer, the defendants' counsel could come up with nothing better than (1) eliminating the criminal remedies, (2) limiting the statute to obstructions "in front of clinic entrances," or (3) forbidding obstruction "within 100 yards" of the entrance. The first suggestion assumes, what we do not believe, that the statute cannot be made precise enough to permit the imposition of criminal punishments for its violation. The second suggestion is as vague as the current statute. The third is underinclusive, since depending on the design and location of a clinic a total blockade might be possible at a distance greater than 100 yards.

There are limits to the precision of language. Confined to forbidding the *complete* blockage of clinic entrances (and thus dispensing with the "unreasonably difficult" language, the source of the alleged vagueness), the Act would be easily evaded, for example by blockaders' leaving just enough space between two of them for a person to squeeze through, touching the blockaders on either side (thus committing a technical battery upon them, though probably a privileged one); or by lying down across the entrance so that the entrant has to step—or jump?—over the blockader. And what of cases in which only one entrance of several (but that the main one) is blocked, or in which all entrances are blocked but persons could easily enter through windows on the ground floor, or in which the roof is strong enough to land a helicopter on? It is difficult to imagine a form of words more perspicuous than "unreasonably difficult" to encompass these and the myriad of other possibilities that come to mind. If as we believe the government is allowed to prohibit the obstruction of access to abortion clinics, it must be allowed to define "obstruction" with sufficient breadth to make the prohibition effective, even if the unavoidable fuzziness of the definition creates a theoretical possibility of deterring lawful expressive activity. The Supreme Court has less doubt than we that "unreasonably obstruct" is clear enough to pass constitutional muster, having remarked in *Cameron v. Johnson, supra,* 390 U.S. at 616, 88 S.Ct. at 1338, that the word "unreasonably" "is a widely used and well understood word and clearly so when juxtaposed with 'obstruct' and 'interfere.' "

■ The last and most substantial issue raised by the defendants concerns the right of trial by jury, secured by both Article III section 2 of the original Constitution and the Sixth Amendment, in all federal criminal prosecutions. We state the issue as one of constitutional law rather than of statutory interpretation because we have been pointed to nothing in the text or history of the Freedom of Access to Clinic Entrances Act that suggests that the drafters intended defendants to have a right to a jury trial and because the defendants do not argue that the right can be derived by statutory as distinct from constitutional interpretation.

Despite the uncompromising language of the Constitution, the Supreme Court has held, consistent with eighteenth century practice, that the constitutional right to a jury trial in federal criminal cases does not cover prosecutions for petty offenses. E.g., *Callan v. Wilson,* 127 U.S. 540, 552–53, 8 S.Ct. 1301, 1304–06, 32 L.Ed. 223 (1888); *Muniz v. Hoffman,* 422 U.S. 454, 475–76, 95 S.Ct. 2178, 2190, 45 L.Ed.2d 319 (1975). Besides the historical argument for this exception, the social interest in effective law enforcement has been deemed to outweigh the citizen's interest in interposing a jury of lay persons between the state and himself when the penalty that he faces is mild. The burden of providing jury trials for all petty offenses has been thought disproportionate to the citizen's need for the additional protection against the power of the state that a jury would give him. *Blanton v. City of North Las Vegas,* 489 U.S. 538, 543, 109 S.Ct. 1289, 1293, 103 L.Ed.2d 550 (1989).

■ As an original matter we might question whether an offense punishable by

up to six months in prison plus a $10,000 fine is properly described as "petty," at least in the absence of historical evidence, not cited to us, that comparable punishments were routinely administered in the eighteenth century without a jury. But we do not write on a clean slate. The Supreme Court, troubled by the difficulty of reasoning one's way by the methods used by courts to the line between petty and serious, has made clear in a brace of recent unanimous opinions that where the maximum prison term is six months there is almost never going to be a constitutional right to trial by jury even if fines or other supplementary sanctions increase the net severity of punishment well beyond that of the prison term standing by itself. *Blanton v. City of North Las Vegas, supra,* involved a state statute that punished driving under the influence of alcohol. The statute authorized a maximum punishment for first offenders of six months' imprisonment plus a fine of $1,000 plus loss of driving privileges for 90 days plus mandatory attendance at an alcohol abuse center at the defendant's expense. The Court held that this statute created a petty offense within the meaning of the Constitution. The Court said that "primary emphasis ... must be placed on the maximum period of incarceration. Penalties such as probation or a fine ... cannot approximate in severity the loss of liberty that a prison term entails. Indeed, because incarceration is an 'intrinsically different' form of punishment, ... it is the most powerful indicator whether an offense is 'serious.'" *Id.* at 542, 109 S.Ct. at 1292–93 (citation omitted). A statute that imposes a maximum sentence of imprisonment of six months is presumed to create a petty offense, and additional statutory penalties will carry the statute over the line only if, in combination with the maximum prison term, they "are so severe that they clearly reflect a legislative determination that the offense in question is a 'serious' one." *Id.* at 543, 109 S.Ct. at 1293.

If careful attention is paid to the word "clearly" in the last passage that we quoted, it is apparent that even though the maximum fine is higher in the present case than it was in *Blanton* it is not so much higher as to make *clear* that Congress considered a first-

time blockade of an abortion clinic a serious offense. When inflation since *Blanton* was decided (modest though it has been) is taken into account along with the absence of any counterpart here to the suspension of a driver's license, it is unclear whether the maximum criminal penalties for the relevant offense in this case (nonviolent obstruction by a first offender) are significantly more severe than those in *Blanton*.

The Supreme Court's next and latest expression of views on the meaning of "petty offense" for purposes of the constitutional right to trial by jury in criminal cases came in *United States v. Nachtigal,* 507 U.S. 1, 113 S.Ct. 1072, 122 L.Ed.2d 374 (1993) (per curiam). A federal regulation punished driving in a national park under the influence of alcohol with a maximum term of imprisonment of six months and a maximum fine of $5,000, five times the maximum fine in *Blanton*. Nevertheless the Supreme Court said that the case was "quite obviously controlled" by *Blanton*. 507 U.S. at 2–4, 113 S.Ct. at 1073. The Court attached no significance to the higher fine, merely remarking that "this monetary penalty 'cannot approximate in severity the loss of liberty that a prison term entails.'" *Id.* at 4, 113 S.Ct. at 1074 (quoting *Blanton,* 489 U.S. at 542, 109 S.Ct. at 1292–93). It is noteworthy that the regulation authorized, as an alternative to imprisonment, a term of probation of five years. This was probation with a bite, or rather a mouthful of bites. The judge was authorized to impose 21 conditions on a convicted defendant sentenced to probation, including requiring him to live in a community correctional facility for the entire term. All this is set forth in the Court's opinion, 507 U.S. at 4, 113 S.Ct. at 1074 and n. *, but did not move the Court to reclassify the offense from petty to serious. Yet being required to live in a correctional facility for five years plus having to pay a fine of $5,000—a combination of sanctions expressly authorized by the regulation upheld in *Nachtigal*—is a more severe punishment than imprisonment for six months plus a fine of $10,000. So confident was the Court that the punishment authorized by the statute involved in *Nachtigal* did not cross the line from petty to serious that

it reversed the court of appeals unanimously on the certiorari papers, without calling for briefs or hearing oral argument.

The defendants point out that Congress has defined the term "petty offense," as used in Title 18 of the United States Code, to mean, so far as might bear on this case, an offense for which the maximum fine, in the case of an individual defendant, does not exceed $5,000. 18 U.S.C. § 19; see *id.*, § 3571(b)(6). The Supreme Court held in *Muniz v. Hoffman, supra*, 422 U.S. at 477, 95 S.Ct. at 2190–91, however, that the statutory definition does not determine whether an offense is petty in the constitutional sense. The fine in that case, held not to entitle the defendant to a jury trial, exceeded the then maximum fine for a Title 18 "petty offense" by a factor of twenty—$10,000, as here, but worth a lot more twenty years ago, versus $500. What is more, 18 U.S.C. § 19 allows a petty offender to be fined $10,000 if the offender is an organization rather than an individual. 18 U.S.C. § 19; see *id.*, § 3571(c)(6). It is hard to believe that the difference in resources between individuals and organizations has constitutional significance, when we reflect that many individuals have more money than many organizations.

We do not want to be understood as holding that criminal punishments other than formal incarceration can never move an offense from the petty to the serious category. If the fine for a first-time nonviolent obstruction of a clinic or other facility covered by the Freedom of Access to Clinic Entrances Act were $1 million, it would be hard to resist the inference that the offense was serious rather than petty. We need not decide in this case where between $5,000 and $1 million the line should be drawn. It is enough that, in light of the reasoning of *Blanton* and *Nachtigal*, it cannot be drawn at $10,000. If we have misunderstood those decisions, the Supreme Court knows how to straighten us out.

The defendants remind us that the Freedom of Access to Clinic Entrances Act creates civil as well as criminal remedies. 18 U.S.C. § 248(c). The civil remedies are not, however, a part of the criminal punishment. They are imposed in proceedings separate from any criminal proceedings brought against the defendant and they are available whether or not the defendant is prosecuted for a criminal violation. They might as well be in a different statute. And insofar as damages or other traditionally "legal" (as distinct from equitable) remedies are sought in a proceeding under the Act, the defendants are entitled by the Seventh Amendment to trial by jury. A misdemeanor prosecution for a traffic offense, which no one would suppose entitled the defendant to a jury, might be the prelude to a wrongful-death suit against him seeking millions of dollars in compensatory and punitive damages. Yet the prospect of such a sequel would not entitle him to a jury in his traffic case.

The other grounds of appeal—that the Freedom of Access to Clinic Entrances Act violates the equal protection clause of the Fourteenth Amendment and that defendant Hatch was not in fact blocking an entrance (a videotape shows she was)—are plainly without merit.

We can summarize briefly. The defendants violated a statute that is within the grant of legislative power to Congress in the commerce clause in Article I of the Constitution. And because it regulates with adequate clarity and precision injurious conduct that is not purely symbolic, the statute does not infringe the First Amendment. The defendants were not entitled to have a jury consider the charges against them, because their offense was "petty" in the sense that the Supreme Court has given the word and was therefore beyond the scope of the constitutional guaranty of trial by jury for federal crimes. Whether the statute was a necessary or a wise exertion of the federal police power, whether it will harm or help the opponents of abortion, and whether Congress should have entitled all persons prosecuted under it to trial by jury are not issues that have been confided to the judiciary for resolution. And, needless to say, we are not authorized to reconsider the right of abortion that is the target of these defendants.

AFFIRMED.

KANNE, Circuit Judge, concurring in part and dissenting in part.

Today, this court decides that the Freedom of Access to Clinic Entrances Act does not violate the First Amendment—a decision with which I concur. The majority continues on, however, to hold that a first violation of the Act involving exclusively nonviolent physical obstruction—which under 18 U.S.C. § 248(b) is punishable by up to both six months in prison and a $10,000 fine—is a "petty" crime, meaning that the defendants charged with such a violation have no constitutional right to a trial by jury. Because I believe that this holding misconstrues relevant Supreme Court precedent and disregards objective evidence of Congress's express intent, from it I must respectfully dissent.

I

It has long been well established in Supreme Court case law that the constitutional right to a trial by jury does not extend to petty offenses. *See Callan v. Wilson,* 127 U.S. 540, 557, 8 S.Ct. 1301, 1307, 32 L.Ed. 223 (1888); *Natal v. Louisiana,* 139 U.S. 621, 624, 11 S.Ct. 636, 637, 35 L.Ed. 288 (1891). According to the Court, what offenses are petty should be determined "not subjectively by recourse of the judge to his own sympathy and emotions, but by objective standards such as may be observed in the laws and practices of the community taken as a gauge of its social and ethical judgments." *District of Columbia v. Clawans,* 300 U.S. 617, 628, 57 S.Ct. 660, 663, 81 L.Ed. 843 (1937).

To this end, the Supreme Court has consistently looked to the state and federal legislatures for guidance as to which crimes should be considered petty and which should be considered serious. The Court instructs that "[t]he judiciary should not substitute its judgment as to seriousness for that of a legislature, which is 'far better equipped to perform the task, and [is] likewise more responsive to changes in attitude and more amenable to the recognition and correction of

their misperceptions in this respect.'" *Blanton v. City of North Las Vegas,* 489 U.S. 538, 541–42, 109 S.Ct. 1289, 1292, 103 L.Ed.2d 550 (1989) (quoting *Landry v. Hoepfner,* 840 F.2d 1201, 1209 (5th Cir.1988) (en banc)).

Uncovering the enacting legislature's judgment of a crime's seriousness entails a two-step interpretive process. First, the Court looks to the crime's statutorily prescribed maximum authorized penalty because, in enacting the maximum penalty, "the legislature has included within the definition of the crime itself a judgment about the seriousness of the offense."[1] *Frank v. United States,* 395 U.S. 147, 149, 89 S.Ct. 1503, 1505, 23 L.Ed.2d 162 (1969) (citing *Duncan v. Louisiana,* 391 U.S. 145, 162 n. 35, 88 S.Ct. 1444, 1454 n. 35, 20 L.Ed.2d 491 (1968)). Second, the Court examines whether that particular maximum penalty indicates a legislative determination of pettiness or one of seriousness. "In determining whether the length of the authorized prison term or the seriousness of other punishment is enough in itself to require a jury trial," the Court compares the penalty against "objective criteria, chiefly the existing laws and practices in the Nation." *Duncan,* 391 U.S. at 161, 88 S.Ct. at 1453. Thus, in case after case the Supreme Court has determined the seriousness of an offense by considering its maximum authorized penalty in light of Congress's statutory definition of "petty offense" in 18 U.S.C. § 19 (and its predecessor, 18 U.S.C. § 1), *see Cheff v. Schnackenberg,* 384 U.S. 373, 379–80, 86 S.Ct. 1523, 1526, 16 L.Ed.2d 629 (1966); *Duncan,* 391 U.S. at 161–62, 88 S.Ct. at 1453–54; *Frank,* 395 U.S. at 150–52, 89 S.Ct. at 1506–07; *Baldwin v. New York,* 399 U.S. 66, 70–71, 90 S.Ct. 1886, 1889, 26 L.Ed.2d 437 (1970); *Blanton,* 489 U.S. at 544–45, 109 S.Ct. at 1294, as well as in light of the prevailing practice among the fifty states concerning what penalties may be imposed absent a jury trial, *see Duncan,* 391 U.S. at 161 & n. 33, 88 S.Ct. at 1454 & n. 33; *Baldwin,* 399 U.S. at 71–72 & n. 18, 90 S.Ct. at 1889–90 & n. 18; *Blanton,* 489 U.S. at 544–45, 109 S.Ct. at 1294.

---

1. Note that "when the legislature has not expressed a judgment as to the seriousness of an offense by fixing a maximum penalty" (such as for criminal contempt), the Court "look[s] to the penalty actually imposed as the best evidence of the seriousness of the offense." *Bloom v. Illinois,* 391 U.S. 194, 211, 88 S.Ct. 1477, 1487, 20 L.Ed.2d 522 (1968).

Congress's statutory definition of "petty offense" in 18 U.S.C. § 19 includes all crimes punishable by no more than six months in prison, by a fine not greater than $5,000 for an individual or $10,000 for an organization, or both.[2] Many states have conformed their practices of granting jury trials in criminal cases to the federal benchmark, while some have enacted more generous standards, including extending the right to trial by jury to all crimes where any term of imprisonment may be imposed.[3]

By comparison to these legislative pronouncements, the Supreme Court has held that a crime punishable by more than six months in prison is always serious for purposes of the constitutional right to a jury trial. *Baldwin*, 399 U.S. at 71–74, 90 S.Ct. at 1889–91. "We cannot … conclude that … administrative conveniences, in light of the practices that now exist in every one of the fifty States as well as in the federal courts, can … justify denying an accused the important right to trial by jury where the possi-

ble penalty exceeds six months' imprisonment." *Id.* at 73–74, 90 S.Ct. at 1890–91.

On the other hand, the question of at what point a penalty other than imprisonment (such as a fine or term of probation) rises to the level of seriousness necessary to implicate the right to a jury trial remains unanswered. The Supreme Court has indicated that, despite a maximum potential imprisonment of no more than six months, such other penalties could render a crime serious enough to warrant a jury trial. *See Blanton*, 489 U.S. at 543, 109 S.Ct. at 1293. But because the Court has never been confronted with a case where it has considered the crime's other potential penalties to be sufficiently serious, the line has never been drawn. Nevertheless, we are given some guidance because, as discussed below, the four cases wherein the Supreme Court has addressed the seriousness of penalties other than imprisonment have—like the cases considering terms of imprisonment—looked to

---

2. Until 1984, Congress defined "petty offense" in 18 U.S.C. § 1 as "[a]ny misdemeanor, the penalty for which does not exceed imprisonment for a period of six months or a fine of not more than $500, or both…." Today, 18 U.S.C. § 19 defines "petty offense" as "a Class B misdemeanor, a Class C misdemeanor, or an infraction, for which the maximum fine is no greater than the amount set forth for such an offense in section 3571(b)(6) or (7) in the case of an individual or section 3571(c)(6) or (7) in the case of an organization." Read together with 18 U.S.C. §§ 3559(a)(7)–(9), 3571(b)(6)–(7), (c)(6)–(7), this definition translates into any offense for which the maximum penalty does not exceed six months in prison, a fine of $5,000 for an individual or $10,000 for an organization, or both. In lieu of incarceration, a petty offender may be sentenced to up to a five-year period of probation, which may be subject to a number of discretionary conditions, and which if violated may result in full resentencing. 18 U.S.C. §§ 3551, 3561–66.

3. In *Baldwin*, the Supreme Court referenced information concerning the prevailing jury trial practice among the states by citing to a survey in the American Bar Ass'n Project on Standards for Criminal Justice, Advisory Committee on the Criminal Trial, Trial by Jury 20–23 (Approved Draft 1968). 399 U.S. at 72 n. 18, 90 S.Ct. at 1890 n. 18. The project's report concluded that most state practices were in keeping with the then-federal standard, 18 U.S.C. § 1, and recommended that that standard "should be the upper limit upon the definition of 'petty offense.' " *Id.*

Today, the ABA advocates a much more lenient standard: "Jury trial should be available to a party, including the state, in criminal prosecutions in which confinement in jail or prison may be imposed." *ABA Standards for Criminal Justice Discovery and Trial by Jury*, Standard 15–1.1 (Right to jury trial), at 121 (3d ed.1996). The commentary to this standard notes:

The states vary in providing a state right to jury trial in criminal cases, whether the right is constitutional or statutory. Many states follow the federal rule by refusing trial by jury to a defendant charged with those minor crimes defined in the state as 'petty offenses' or 'infractions.' Other states, following the earlier lead of the ABA standards, provide for trial by jury in all cases where there is potential imprisonment. Some states have constitutional provisions for nonjury trials of petty offenses in the first instance, with right to *de novo* jury trial on appeal.

*Id.* at 123 (footnotes omitted). It is also worth noting that even in those states that follow the federal rule, many statutorily define "petty offenses" or "infractions" more restrictively than has Congress. *See, e.g.,* Cal. Penal Code §§ 19.6, 19.8 (no jury trial for "infraction," which is defined as an offense for which there can be no imprisonment and for which the maximum fine does not exceed $250); Colo. Rev. Stat. § 16–10–109(1)–(2) (defining "petty offense," for which there is no jury trial unless the defendant pays a jury fee, as any crime for which the penalty does not exceed six months in prison, a $500 fine, or both).

the judgments expressed by the state and federal legislatures concerning what is serious and what is petty.

In *Frank v. United States*, the defendant had been convicted of criminal contempt in federal court and sentenced to a three-year term of probation. 395 U.S. at 148, 89 S.Ct. at 1504–05. The Court first noted that prior decisions had relied upon Congress's definition of "petty offense" in 18 U.S.C. § 1. *Id.* at 150 n. 3, 89 S.Ct. at 1506 n. 3. It then observed that in enacting the probation statute, Congress had made the possibility of probation applicable to "any offense not punishable by death or life imprisonment," i.e., to both petty and serious offenses alike.[4] *Id.* at 150, 89 S.Ct. at 1506. "Therefore," the Court reasoned, "the maximum penalty authorized in petty offense cases is not simply six months' imprisonment and a $500 fine. A petty offender may be placed on probation for up to five years . . . ." *Id.* at 150–51, 89 S.Ct. at 1506. The Court thus concluded: "Petitioner's sentence is within the limits of the congressional definition of petty offenses. Accordingly, it was not error to deny him a jury trial." *Id.* at 152, 89 S.Ct. at 1507.

In *Muniz v. Hoffman*, the defendant, a union organization, had been convicted of criminal contempt and sentenced to pay a $10,000 fine. 422 U.S. 454, 457, 95 S.Ct. 2178, 2181, 45 L.Ed.2d 319 (1975). At the time *Muniz* was decided, Congress's "petty offense" definition in 18 U.S.C. § 1 placed the upper limit for fines at $500; however, the definition did not (as 18 U.S.C. § 19 does today) specifically address what fine level would be considered serious for an *organization* as opposed to an individual. The union argued that because the fine imposed was greater than $500, it was automatically enti-

tled to a trial by jury. The Court disagreed and refused to blindly apply the congressional definition to all circumstances because it did not believe that the definition could plausibly be read to suggest Congress's judgment that a fine over $500 will always be serious, even when imposed upon a large organization. *Id.* at 477, 95 S.Ct. at 2191. The Court explained that "[i]t is not difficult to grasp the proposition that six months in jail is a serious matter for any individual, but it is not tenable to argue that the possibility of a $501 fine would be considered a serious risk to a large corporation or labor union." *Id.* In conclusion, the Court further considered the relative financial impact of the fine on the union: "This union . . . collects dues from some 13,000 persons; and although the fine is not insubstantial, it is not of such magnitude that the union was deprived of whatever right to jury trial it might have under the Sixth Amendment." *Id.*

Thus, the Supreme Court refused to rely upon 18 U.S.C. § 1 in *Muniz* only because it did not believe that the definition represented a legislative judgment of seriousness with respect to a fine levied on a large organization. Accordingly, our sister circuits have interpreted the *Muniz* holding as limited exclusively to fines imposed upon organizations, and therefore they have consistently relied upon the congressional definition of "petty offense" when considering the seriousness of fines levied on individual defendants.[5] The majority, unlike these other circuits, expresses incredulity that the difference between an individual and an organization could be constitutionally relevant. *Supra*, at 1379. However, Congress expressed its judgment that what fine level indicates seriousness for purposes of the right to a jury trial differs

---

**4.** At the time *Frank* was decided, probation was governed by 18 U.S.C. §§ 3651–55. These statutes were subsequently repealed, and probation is today addressed at 18 U.S.C. §§ 3561–66.

**5.** *See Douglass v. First National Realty Corp.*, 543 F.2d 894, 902 (D.C.Cir.1976); *United States v. Professional Air Traffic Controllers Org.*, 678 F.2d 1, 4–5 (1st Cir.1982); *United States v. Troxler Hosiery Co., Inc.*, 681 F.2d 934, 936 n. 2 (4th Cir.1982); *Girard v. Goins*, 575 F.2d 160, 164–65 (8th Cir.1978); *United States v. Hamdan*, 552 F.2d 276, 278–80 (9th Cir.1977); *United States v.*

*McAlister*, 630 F.2d 772, 774 (10th Cir.1980). The Fifth Circuit initially interpreted *Muniz* as a statement by the Supreme Court that only imprisonment and not a fine was important in determining whether a crime was serious or petty, *see Landry v. Hoepfner*, 840 F.2d 1201, 1216 n. 30 (5th Cir.1988); however, since the Supreme Court decided *Blanton*, the Fifth Circuit has indicated that it would look to the congressional definition of "petty offense" in determining whether a heavy fine evidenced a legislative determination of seriousness. *See United States v. Time*, 21 F.3d 635, 642 (5th Cir.1994).

between individuals and organizations when, in amending the definition of "petty offense" in 1984, it enacted a much higher maximum fine for organizations than for individuals (interestingly enough, $10,000, the amount the Supreme Court considered petty when levied against an organization in *Muniz*). See Criminal Fine Enforcement Act of 1984, Pub.L. No. 98–596, § 8, 98 Stat. 3134, 3138. From the legislative history of this enactment, it is apparent that the rationales of Congress for the differing fine levels between individuals and organizations were twofold. First, Congress indicated its belief that organizations *generally* have greater resources than individuals. H.R. REP. No. 98–906, 98th Cong., 2d Sess. 15–16, 19 (1984), *reprinted at* 1984 U.S.C.C.A.N. 5433, 5447–48, 5452. Secondly, and most importantly, Congress explained that because an organization cannot be imprisoned in addition to paying a fine as an individual can, a higher fine must be levied against an organization in order to attain the same level of severity presented by a combination of imprisonment and a lower fine imposed upon an individual. *Id.*

In *Blanton v. City of Las Vegas,* the Supreme Court considered the seriousness of a Nevada drunk driving law, under which a defendant faced a possibility of up to six months in prison (or alternatively, forty-eight hours of community service wearing clothing identifying him as a DUI offender), a fine of up to $1,000, loss of his driver's license for ninety days, and a requirement to attend an alcohol abuse education course at his own expense. 489 U.S. at 539–40, 109 S.Ct. at 1291. The Court held that where an offense is punishable by no more than six months in prison, it is presumed to be petty. *Id.* at 543, 109 S.Ct. at 1293. However, a defendant may rebut this presumption "if he can demonstrate that any additional statutory penalties, viewed in conjunction with the maximum authorized period of incarceration, are so severe that they clearly reflect a legislative determination that the offense in question is a 'serious' one." *Id.*

The majority invokes the *Blanton* Court's language (and particularly, the word "clearly") to support its proposition that a fine will

virtually never be serious enough to implicate the right to a jury trial. *Supra,* at 1377–78. However, the majority pays no heed to the method by which the unanimous *Blanton* Court went on to determine whether the Nevada law's $1,000 fine clearly reflected a legislative determination of seriousness. In keeping with its long line of precedent, the Court compared the $1,000 fine against objective criteria—the laws and practices in the Nation-reasoning that "[a]s for the possible $1,000 fine, it is well below the $5,000 level set by Congress in its most recent definition of a 'petty' offense . . . and petitioners do not suggest that this congressional figure is out of step with state practice for offenses carrying prison sentences of six months or less." *Id.* at 544–45, 109 S.Ct. at 1293–94, 109 S.Ct. at 1294. As the Court noted, "[w]e have frequently looked to the federal classification scheme in determining when a jury trial must be provided," and "we [have] looked to state practice in our past decisions, . . . chiefly to determine whether there was a nationwide consensus on the potential term of imprisonment or amount of fine that triggered a jury trial. . . ." *Id.* at 545 n. 11, 109 S.Ct. at 1294 n. 11, 489 U.S. 546, 109 S.Ct. 1294 n. 11, 103 L.Ed.2d 559. Thus, *Blanton* reiterates that we are to look to the congressional definition of "petty offense," as well as to the prevailing practice of the state legislatures concerning what penalties correlate with seriousness, in evaluating whether a particular fine clearly evinces a legislative determination of seriousness.

Lastly, in *United States v. Nachtigal,* the Court addressed the seriousness of 36 C.F.R. §§ 4.23(a)(1)-(2) (1992), a federal regulation that prohibited operation of a motor vehicle in a national park while under the influence of alcohol. 507 U.S. 1, 2, 113 S.Ct. 1072, 1072, 122 L.Ed.2d 374 (1993). The offense was designated as a class B misdemeanor under the federal classification system and, therefore, was subject to a maximum authorized penalty of up to both six months in prison and a $5,000 fine. *Id.* (citing 18 U.S.C. §§ 3581(b)(7), 3571(b)(6), (e)). As an alternative to imprisonment, a sentencing court might instead impose a term of probation not to exceed five years, which could be subject to any number of discretionary condi-

tions. *Id.* (citing 18 U.S.C. §§ 3561(a)(3), (c)(2), 3563(b)). The Supreme Court held, in a short per curiam opinion, that this offense was petty for purposes of the right to a jury trial. *Id.* at 4, 113 S.Ct. at 1074.

However, *Nachtigal* was only, as described by the Court, "a relatively routine application of the rule announced in *Blanton.*" *Id.* Although the short *Nachtigal* opinion never expressly refers to the congressional definition of a "petty offense," its holding represents merely a straightforward application of the analysis in *Blanton.* In determining whether a $1,000 fine clearly evidenced a legislative determination of seriousness, the *Blanton* Court looked to the congressional definition of a petty offense, which includes "a Class B misdemeanor, a Class C misdemeanor, or an infraction" with a fine no greater than $5,000. 18 U.S.C. § 19. The offense in *Nachtigal* was in fact a class B misdemeanor, and therefore its various penalties (prison or probation, and a $5,000 fine) fell squarely within Congress's judgment of what is petty. Thus, it is clear that the penalties attached to the offense in *Nachtigal* did not manifest a legislative judgment of seriousness. The Court was able to render an opinion without briefs or oral argument because *Nachtigal* was, under the reasoning of *Blanton*, an easy case.

The majority attempts to make more of *Nachtigal* than it is. First, the majority notes how the *Nachtigal* Court "attached no significance" to the $5,000 fine, even though it was five times the $1,000 maximum fine in *Blanton.* *Supra*, at 1378. The majority interprets such nonchalance as an indication that a $5,000 fine is not even close to being serious. However, as explained above, there is no incongruity between the fact that *Nachtigal* was a "relatively routine application of the rule announced in *Blanton*" and the fact that the case before us is not. The penalties for the crime we consider today, unlike those in *Nachtigal*, fall without the congressional definition of a "petty offense." And the mere fact that a $5,000 fine, which is much greater than a $1,000 fine, is considered petty does not necessitate the conclusion that a $10,000 fine, which is much greater than a $5,000 fine, be similarly treated—

especially when Congress has clearly expressed its judgment that a $5,000 fine is petty and a $10,000 fine is not. One might question whether a $10,000 fine is substantially greater than a $5,000 one, but the Supreme Court has explained that drawing the line between petty and serious "cannot be wholly satisfactory, for it requires attaching different consequences to events which, when they lie near the line, actually differ very little." *Duncan*, 391 U.S. at 161, 88 S.Ct. at 1453. This is precisely why the Supreme Court has instructed us to look to the legislatures for guidance in drawing it.

Secondly, the majority points to admittedly strong language in *Nachtigal* that a fine "cannot approximate in severity the loss of liberty that a prison term entails." *Supra*, at 1378 (quoting *Nachtigal*, 507 U.S. at 4, 113 S.Ct. at 1074). At first blush, this language seems to imply that a fine could never be serious enough to tip the scale from petty to serious. However, this language is a direct quote from *Blanton*, and the Court in *Blanton* did not intend to hold that a heavy fine could not be serious enough to implicate the right to a jury trial. 489 U.S. at 542–43, 109 S.Ct. at 1292–93. Rather, the *Blanton* Court indicated that a fine could in fact evidence a legislative determination of seriousness, and it looked to the congressional definition of "petty offense" in determining whether the $1,000 fine at issue did so. *Id.* at 544–45, 109 S.Ct. at 1294. The fact that the average defendant's willingness to pay to stay out of prison is extremely high does not mean that a heavy fine can never denote a serious offense. The majority itself admits that a fine could potentially be of such severity as to require a jury trial (postulating $1 million), but it refuses to draw a line. *Supra*, at 1379. The Supreme Court has instructed, however, that "[t]he judiciary should not substitute its judgment as to seriousness for that of a legislature," and Congress has already indicated its judgment as to where the line should be drawn by enacting 18 U.S.C. § 19.

Thirdly, the majority makes much of the penalties that were considered petty in *Nachtigal*, maintaining that because those penalties were more serious than the ones we address today, we must find a nonviolent

first violation of the Freedom of Access to Clinic Entrances Act to be petty. *Supra*, at 1378–79. The majority focuses on the fact that as a substitute for imprisonment the defendant could have been sentenced to five years' probation, which at the sentencing court's discretion might be subject to one or more of several conditions set out at 18 U.S.C. § 3563(b), including having to spend the five-year probation period residing at a halfway house. The majority reasons that "being required to live in a [community] correctional facility for five years plus having to pay a fine of $5,000—a combination of sanctions expressly authorized by the regulation upheld in *Nachtigal*—is a more severe punishment than imprisonment for six months plus a fine of $10,000." *Supra*, at 1379. However, this comparison is faulty; it rests upon the assumption that five years' probation (even in a halfway house) is a more severe penalty than six months in prison—an assumption that was completely rejected by the Court in *Nachtigal*, 507 U.S. at 4, 113 S.Ct. at 1074. According to the Supreme Court, five years' probation and a $5,000 fine (found petty in *Nachtigal*) is a lesser penalty than six months in prison and a $5,000 fine (also found petty in *Nachtigal*). *Id.* Six months in prison and a $10,000 fine (the maximum authorized penalty we address today) is therefore a *greater* penalty than any of the possible penalty combinations found petty in *Nachtigal*.

In sum, although the Court in *Nachtigal* made quick work of the facts before it, nothing in that per curiam opinion indicates the Supreme Court's intention to discard decades of precedent instructing us to look to the legislatures in determining whether a particular maximum penalty represents a legislative judgment of seriousness.

## II

Relying on Congress's definition of "petty offense" as an indication of what penalties equate with seriousness is particularly appropriate in this case. First of all, the defendants are charged with a federal crime. Given that Congress authorized the maximum penalties for a nonviolent first violation of the Act, an expression of Congress's judgment concerning what penalties are serious enough to warrant a jury trial is extremely probative of whether Congress believes that such a nonviolent first violation is a serious crime.

Additionally, a review of the legislative history attendant to 18 U.S.C. § 19 makes clear that the statutory definition of "petty offense" is direct evidence of Congress's judgment that a nonviolent first violation of the Act is a serious crime for purposes of the constitutional right to a jury trial. First, the legislative history indicates that Congress is aware of the Supreme Court's historical practice of looking to the congressional definition of "petty offense" in determining whether an offense's penalty indicates a legislative determination of seriousness.[6] Secondly, the legislative history shows that Congress enacted 18 U.S.C. § 19 for the sole purpose of expressing its legislative judgment concerning what penalties indicate a crime serious enough to merit a jury trial,[7]

---

6. When Congress amended 18 U.S.C. § 1 in 1984, Criminal Fine Enforcement Act of 1984, § 8, 98 Stat. at 3138, it explained:

   There is, as a matter of law, no right to a jury trial for a petty offense.... Since the Constitution does not explicitly define what is petty, the courts have had to look elsewhere to determine whether a punishment ... is petty or serious. In the interests of uniformity, objectivity, and practical judicial administration, the courts have therefore looked to 18 U.S.C. § 1 as the monetary measure of a serious offense for the purposes of the right to jury trial.

   H.R. REP. No. 98–906 at 19–20 (citations and internal quotation marks omitted).

   In enacting 18 U.S.C. § 19 to supersede 18 U.S.C. § 1, Criminal Fine Improvements Act of

1987, Pub.L. No. 100–185, § 4(a), 101 Stat. 1279, 1279, Congress similarly noted:

   In *Frank v. United States*, the Supreme Court held that the constitutional right to trial by jury does not apply to petty offenses.... The Supreme Court has indicated that 18 U.S.C. 1 is a measure of the seriousness of an offense for purposes of the right to trial by jury.

   H.R. REP. No. 100–390, 100th Cong., 1st Sess. 4–5 (1987), *reprinted at* 1987 U.S.C.C.A.N. 2140–41 (footnotes omitted).

7. When 18 U.S.C. § 19 was enacted in 1987, Criminal Fine Improvements Act of 1987, § 4(a), 101 Stat. at 1279, the House Report explains:

   Section 4(a) of the bill amends chapter 1 of title 18, United States Code, to carry forward the definition of "petty offense." ... The Sen-

and that Congress has amended the definition to keep it current as a measure of which crimes are petty and which are serious.[8] Finally, and most importantly, the legislative history makes clear that Congress considers a crime punishable by up to six months in prison and a $10,000 fine to be a serious one, deserving of the right to a jury trial.[9]

Now, I do not suggest that anything in 18 U.S.C. § 19 creates a statutory right to a jury trial. *See United States v. Kozel*, 908 F.2d 205, 207 (7th Cir.1990), *cert. denied*, 498 U.S. 1089, 111 S.Ct. 969, 112 L.Ed.2d 1055 (1991). Nor do I contend that Congress's pronouncements absolutely dictate the boundaries of the constitutional right to a trial by jury. A legislature cannot by statutory enactment define the limits of a constitutional right, and both the Supreme Court and Congress have noted that 18 U.S.C. § 19 has no magical properties, no "talismanic significance." *See Muniz*, 422 U.S. at 477, 95 S.Ct. at 2190; H.R. REP. No. 98–906 at 19–20.

But although 18 U.S.C. § 19 does not absolutely control the determination of what

---

tencing Reform Act ... repeals 18 U.S.C. 1 as of November 1, 1987. That repeal, together with other provisions enacted by the Sentencing Reform Act that set fine levels for misdemeanors at $25,000 for an individual and $100,000 for an organization, raises questions about when a jury trial is required for persons charged with minor misdemeanors.... Section 4(a) of the bill adds a new section (section 19) to 18 U.S.C. ch. 1 that carries forward the current definition of petty offense.

H.R. REP. No. 100–390 at 4–5 (footnotes omitted). Similarly, when 18 U.S.C. § 19 was amended in 1988, Anti–Drug Abuse Act of 1988, Title VII, § 7089, 102 Stat. 4187, 4409, the Senate Judiciary Committee noted that "[t]he amendment is needed to carry forward fully the concept of petty offense for purposes of the exception to the constitutional right to trial by jury," *Section Analysis of Judiciary Committee Issues in H.R. 5210*, § 7089, 134 CONG. REC. 32692, 32705 (Nov. 10, 1988) (remarks of Sen. Biden, Chairman of the Senate Judiciary Committee), and the House Judiciary Committee noted that "[t]he significance of the label 'petty offense' is that the constitutional right to a jury trial does not apply if a person is charged with a petty offense," *Section–by–Section Analysis of Title VII, Subtitle B, Minor and Technical Criminal Law Amendments*, § 7089, 134 CONG. REC. 33296, 33301 (Oct. 21, 1988) (remarks of Rep. Conyers, Chairman of the Subcommittee on Criminal Justice of the House Judiciary Committee).

8. In 1984, Congress amended the maximum fine level in 18 U.S.C. § 1 from $500 to $5,000 for an individual and $10,000 for an organization. Criminal Fine Enforcement Act of 1984, § 8, 98 Stat. at 3138. The House Report explains the purpose of the amendment:

The amount presently used in the definition of petty offense, $500, was set by Congress in 1930. The Committee is raising this figure to account for inflation. If a $500 fine for an individual was "petty" in 1930, when the per capita disposable income was $599, then $5,000 is "petty" today, when the per capita disposable income is $9,969.

H.R. REP. No. 98–906 at 19 (citations omitted). Note that if the 1984 $5,000 figure is adjusted for inflation up to the present day, it reflects a legis-

lative judgment that a fine levied on an individual is serious if it is greater than $7,317.34, an amount that is still much less than the $10,000 fine that could have been imposed upon the defendants in this case. (Inflation figures taken from the *1996 World Almanac*, with inflation calculated as the annual percentage change in the overall Consumer Price Index).

9. When Congress enacted 18 U.S.C. § 19 in 1987, it defined "petty offense" as "a Class B misdemeanor, a Class C misdemeanor, or an infraction...." Criminal Fine Improvements Act of 1987, § 4(a), 101 Stat. at 1279. The goal of this enactment was to carry forward the definition of "petty offense" as any crime for which a defendant could be punished by up to six months in prison, a $5,000 fine for an individual or a $10,000 fine for an organization, or both. H.R. REP. No. 100–390 at 5. However, phrasing the definition of petty offenses only by reference to the federal classification system left open a few instances in which a Class B misdemeanor might be subject to fines higher than the $5,000 and $10,000 limits:

The 1987 amendments ... did not accomplish [their] goal fully because the definition of petty offense did not specifically include a maximum fine level.... [T]he 1987 definition of petty offense inadvertently included a class of offenses which may be petty for constitutional purposes even though they are Class B or C misdemeanors ...: offenses punishable by six months' or less imprisonment which, by the terms of the statutes setting forth such offenses, carry a higher maximum fine than the $5,000 and $10,000 levels....

*Section Analysis of Judiciary Committee Issues in H.R. 5210*, 134 CONG. REC. at 32705. In response to this problem, Congress amended the definition in 1988 to make clear its judgment that a fine above $5,000 for an individual or $10,000 for an organization renders an offense serious: "Section 7089(a) modifies the definition of petty offense in 18 U.S.C. § 19 by providing that a petty offense cannot call for a fine in excess of $5,000 for an individual and $10,000 for an organization...." *Section–by–Section Analysis of Title VII, Subtitle B*, 134 CONG. REC. at 33301.

crimes are petty, it certainly must inform our decision. *See Kozel,* 908 F.2d at 207. As discussed above, relevant Supreme Court precedent instructs us to look to the judgment of the legislatures for guidance in determining whether a crime's authorized penalties clearly represent a legislative determination of seriousness. Where Congress has with its left hand expressly stated its judgment that a crime punishable by six months in prison and a fine greater than $5,000 is serious, and has with its right hand enacted a law punishable by up to six months in prison and a $10,000 fine, there is clear evidence that Congress considers that crime to be serious. To consider such a crime petty and deny defendants charged with it the right to trial by jury, as the majority does today, is to contravene Supreme Court instruction by substituting a judicial determination as to seriousness for that of Congress. I would therefore vacate the defendants' convictions and remand for a retrial by jury.